EDWARD GLEASON AND EDWARD D. GLEASON, DOING BUSINESS AS GLEASON & SON.

*v.*

THE STATE OF ILLINOIS.

*Opinion filed August 28, 1902.*

BUILDING CONTRACTS—*when architect's certificate is final.* Contractors under a building contract which makes the architect the judge of whether any work or material is an extra, and of the amount which should be added or deducted from the contract for such change or addition, who have a right to appeal to arbitration if they think they are not fairly treated, and fail to do so, can neither claim that certain work should have been considered an extra which the architect did not so consider, nor that a larger sum should be allowed than was allowed by the architect. When parties to a building contract agree upon an arbitrator to settle disputes, and when the contract provides that no money is payable thereon except upon the certificate of the architect, the decision of the arbitrator is final in the absence of fraud or mistake.

On the 5th day of March, A. D. 1901, Edward Gleason and Edward D. Gleason, doing business under the firm name of Gleason & Son, filed in the Auditor's office the claim in this case, against the State of Illinois for the sum of $96,859.26.

The claim is in the nature of an action of assumpsit, growing out of a contract made by the said Edward Gleason & Son, on June 7, A. D. 1898, with the Commissioners of the Asylum for the Incurable Insane, at Bartonville, Illinois, to construct five buildings, namely Employes' Quarters, Domestic Building, Supply Department, Power House and Shops and Boiler House.

The contract was in writing and the right was reserved to the Commissioners to omit certain portions of the work called for by the contract and to make certain changes therein enumerated.

The Commissioners elected to omit the power house and shops and to make the changes enumerated in the addenda.

The contract price after allowing for the omissions and changes aforesaid, was one hundred fifty-four thousand six hundred seventy-eight dollars and fifty cents, ($154,678.50.)

The contract required the execution of bond for the faithful performance thereof by the said Gleason & Son, before the same should become operative and effective. The bond was executed and approved on the 15th day of June, A. D. 1898.

The plans and specifications upon which the contract was let, and which were referred to in the contract, were prepared by Messrs. Reeves & Baillie, architects, of Peoria, Illinois. And the work was to be done, and materials to be furnished by the said Gleason & Son, under the direction and to the satisfaction of the said Reeves & Baillie, who by the said contract were made the superintendents of the construction of the said building.

Article III of the contract provided that "No alterations should be made in the work shown or described by the drawings and specifications, except upon a written order of the architect and Commissioners and when so made, the value of the work added or omitted shall be computed by the architects, and the amount so ascertained shall be added to or deducted from the contract price. In case of dissent from such award by either party thereto, the valuation of the work added or omitted shall be referred to three disinterested arbitrators, who shall be each practical mechanics and builders, one to be appointed by each of the parties to this contract, and the third by the two thus chosen; the decision of any two of whom shall be final and binding, and each of the parties hereto shall pay one-half of the expense of such reference.

Article IV provided that "The contractors should within twenty-four hours after receiving written notice from the architects to that effect, proceed to remove from

the grounds and buildings all material condemned by them, whether worked or unworked, and to take down all portions of the work which the architect shall by like written notice condemn as unsound or improper, or as in any way failing to conform to the drawings and specifications."

Article V of the contract provided, "Should the contractor at any time refuse or neglect to supply a sufficiency of properly skilled workmen, or of materials of a proper quality, or fail in any respect to prosecute the work with promptness and diligence, or fail in the performnace of any of the argreements herein contained, such refusel, neglect or failure being certified by the architect, the Commissioners shall be at liberty, after three days written notice to the contractor, to provide any such labor or materials, and to deduct the cost thereof from any money then due or thereafter to become due to the contractor under this contract; and if the architect shall certify that such refusal, neglect or failure is sufficient grounds for such action, the Commissioners shall also be at liberty to terminate the employment of the contractor for the said work and to enter upon the said premises and take possession, for the purpose of completing the work comprehended under this contract, of all materials, tools and appliances thereon, and to employ any other person or persons to finish the work and to provide the materials therefor, and in case of such discontinuance of the employment of the contractor he shall not be entitled to receive any further payment under this contract until the said work shall be wholly finished at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expenses incurred by the Commissioners, in finishing the work, such excess shall be paid by the Commissioners to the contractor; but if such expenses shall exceed such unpaid balance, the contractor shall pay the difference to the Commissioners. The expenses incurred by the Commissioners as herein provided, either for furnishing ma-

terials or finishing the work, and any damage incurred through such default, shall be audited and certified by the architects whose certificates thereof shall be conclusive upon the parties."

Article VI provided that the work should be all completed by the first day of April, A. D. 1899, and time was made of the essence of the contract.

Article VII provided that, "Should the contractor be obstructed or delayed in the prosecution or completion of his work by the act, neglect, delay or default of the Commissioners, or the Architects, or of any other contractor employed by the Commissioners upon the work, or by any damage which may happen by fire, lightning, earthquake or cyclone, or by the abandonment of the work by the employes, through no default of the contractor, then the time herein for the completion of the work shall be extended for a period equivalent to the time lost by reason of any or all of the causes aforesaid; but no such allowance shall be made unless a claim therefor shall be presented in writing to the architect within twenty-four hours of the occurrence of such delay. The duration of such extension shall be certified by the architects, but appeal from their decision may be made to arbitration, as provided in Article III of this contract."

Article VIII provided that the Commissioners should provide all labor and materials not included in this contract in such a manner as not to delay the material progress of the work, and in event of failure so to do, thereby causing loss to the contractor, agree that they will reimburse the contractor for such loss; and the contractor agrees that if he shall delay the material progress of the work so as to cause any damage for which the Commissioners shall become liable (as above stated) that he shall make good to the Commissioners any such damage. The amount of such loss or damage to either party shall, in every case, be fixed and determined by the architect or by arbitration as provided in Article III of this contract.

It was provided in Article IX that payments should be

made by the Commissioners, to the contractors, in installments, as follows: Ninety per cent of all materials and labor that has been used in the construction of the buildings, as per estimates of the architects issued the first of each month. Final payment to be made within thirty days after the contract is fulfilled and accepted by the architect and Commissioners.

And if at any time there shall be evidence of any lien, or claim, for which, if established, the Commissioners or the said premises might become liable, and which is chargeable to the contractor, the Commissioners shall have the right to retain out of any payment then due, or thereafter to become due, an amount sufficient to completely indemnify them against such lien or claim.

Work was commenced on the buildings provided for in the said contract about the first of August, 1898, but was not completed by the first of April, 1899. Commissioners did not seek to terminate the employment by reason of the lapse of time given for the completion of the contract, but permitted the contractors to do work after that time.

On the 12th day of May, 1899, the architects delivered to the Commissioners a notice as required by said contract, reciting that the contractors had neglected and are now neglecting to supply a sufficiency of properly skilled workmen and material for the prosecution of the work upon the buildings under said contract. That the workmen have refused to proceed with any work, and that there are no materials with which said workmen can be employed, and that said contractors have violated said agreement in such failure, and have also violated the agreement in failing to complete the buildings within the time specified in said contract, etc.

On the same day, (the 12th of May) the Commissioners, in compliance with the terms of the contract, caused a notice to be served upon the contractor as follows:

"PEORIA, May 12, 1899.

To Edward Gleason & Son, Contractors:

You are hereby notified that the architects for the un-

dersigned in the construction of the buildings for the Asylum for the Incurable Insane at Bartonville, in accordance with the contract between you and the undersigned, have certified to us that you have failed and neglected, and now fail and neglect to supply a sufficiency of properly skilled workmen or materials of the proper quality with which to prosecute the work of said asylum buildings at Bartonville, Illinois, according to your contract with the undersigned, and we now hereby notify you further, that unless you do within three days of the service of this notice, supply a sufficiency of properly skilled workmen and materials of the proper quality, we shall terminate your contract as contractors for said work, and enter upon and take possession of said premises, and shall take possession of all materials, tools and appliances thereon, and shall complete said work and shall charge the expense thereof to you.  You are further notified that you have violated the contract in failing to complete the buildings within the time specified in said contract, and for these defaults we have elected to declare your contract forfeited, and we shall retain any and all sums that may be due you, for the purpose of paying your sub-contractors."

(Signed by the Commissioners.)

The evidence shows that at the expiration of the three days, that Mr. Edward Gleason, Sr., appeared before the Commissioners at their meeting and applied for three days' extension of the time in which to demonstrate his ability to proceed with the contract, and it further appears that the extension was granted.

On the 19th of May, at the expiration of this extension, the Commissioners caused the second notice to be served upon the said Gleason & Son, reciting that, "having recently served notice of forfeiture of your contract, and having verbally given you three days ending May 19th, to enable you to ascertain whether you could go on and complete your contract, we now find that you have not a sufficient number of skilled workmen, or a

sufficient amount of materials to push the work under your contract, and it being apparent that you are not able to complete the same, we are compelled to adhere to our notice of forfeiture, and shall take possession and complete the work as in your contract with the undersigned provided. We waive no rights under our previous notice, simply giving you an opportunity to demonstrate your ability to proceed and we are now satisfied that you are wholly unable to do so."

The evidence shows that Mr. Reeves served this notice by reading it to Mr. Edward Gleason, at the works, and also delivering him a copy, and that Mr. Gleason surrendered possession without objection or protest, and left the grounds, and never at any time afterwards, offered to do any work upon the buildings, or made any request to be permitted to complete the buildings under his contract.

The Commissioners thereupon took charge of the buildings, materials, tools and appliances upon the grounds.

They also notified the bondsmen of Gleason & Son, and offered to permit them to complete the contract. Their representative came down to look over the situation, but did not indicate any desire or intention to accept the offer and left without making any reply to the proposition.

The Commissioners then made arrangements with the sub-contractors of Gleason & Son, to complete their contracts, and employed a foreman, and other workmen, and procured material and proceeded with the work of completion of the said buildings under the provisions of Article V of the contract.

The Commissioners had paid to Gleason & Son, on the contract, the sum of $91,943.64 at the time they suspended work in May, leaving still due them upon the completion of the contract, the sum of $62,734.85. The Commissioners proceeded with the work until this amount was expended, and then they had to suspend work until after the meeting of the legislature when an-

other appropriation was procured to complete the work. And the evidence shows that they had expended the sum of $56,869.29 more in completing the buildings on December 2, 1899, than remained due the Gleasons, for the entire completion of the work when they suspended work on the 19th of May, 1899.

Claimants now contend that the Commissioners unlawfully took charge of said buildings, and illegally terminated the employment of the claimants as such contractors. That such unlawful action on the part of the Commissioners amounts to a rescission of the contract on the part of the Commissioners, and that claimants have the election of bringing suit on the contract, or may ignore the contract entirely, and bring suit on a quantum meruit for the value of the work done on the contract, less payments made on same, and for the value of all work done and materials furnished, on extra work, less payments made on same, (ignoring the allowances which have been made to them for said extra work by the architects.) Also for the materials, tools and appliances taken charge of by the State.

Claimants file a bill of particulars in which they set up the following demands for work, damages, materials, tools, etc:

| | |
|---|---:|
| Value of work done up to May 19, 1899 . . . . . | $124,824.19 |
| To revising and designing and making new iron plans . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,300.00 |
| To extra work done on four buildings up to May 19, 1899 . . . . . . . . . . . . . . . . . . . . . . . | 19,518.85 |
| To 52 tons of extra iron . . . . . . . . . . . . . . . . | 4,160.00 |
| To the overcharge of old material . . . . . . . . . | 1,149.12 |
| To misappropriation of $1,009.87 for moneys withheld from Gleasons to pay alleged Bushnell brick claim . . . . . . . . . . . . . . . . . | 1,009.87 |
| To water plant (appropriated by State) . . . | 3,050.00 |
| To increased cost of doing work in winter months . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,207.00 |

Contractor's plant (appropriated by State)    11,423.00
Material on ground ......................     7,162.00
                                            ─────────────
                                            $191,804.03

By cash, contract and extras
By cash, old material ....................    94,944.77
                                            ─────────────
    Balance  .............................   $96,859.26

Claimants on the trial of the case elect to rely upon a quantum meruit and treat the contract as rescinded by the Commissioners.

The defense claim that the work was done under contract, and that the contract is still in full force and effect; that the Commissioners acted under the provisions of Article V of said contract, and in compliance with the provisions thereof, in taking charge of said buildings and completing the same; that claimants had been allowed by the architect, and paid the sum of $7,815.19 for extras, and not having made any objection or asked for arbitration as required by the contract, they cannot claim anything further for extras. That the Commissioners have paid the sum of $57,000 more for expenses of completing the building than was due the said Gleason & Son, under their contract, and therefore no 'award can be allowed to them by this Commission.

Claimants insist that the action of the Commissioners in taking charge of the buildings, and completing them, were illegal and amounted to a rescission of said contract:

First: For the reason that they were not in default under their contract as certified by the architect.

Second: There was not a proper certificate of the architect to authorize the Commissioners to take charge of said buildings and proceed to complete them under the provisions of Article V of the contract.

Under Article V, the Commissioners were clearly authorized to take possession of the buildings and complete them upon certain conditions if the contractors were not proceeding with the work properly, or if they

were not providing a sufficiency of properly skilled workmen and materials, and the architect was of the opinion that such facts were sufficient to warrant the Commissioners in doing so.

This is clearly the intention of the parties to the contract. And when the architect made his certificate to the Commissioners, it is also clear that he understood that he was making a certificate which the contract required of him, in order to justify the Commissioners to take charge of the buildings and complete them. It is also clear that each of the parties to the contract so understood it. No objection was made to the form of the notice, or claim by claimant, or his attorney, who was present at the meeting, that the notice was not sufficient to warrant a termination of the employment of the said Gleason & Son, as such contractors. Neither were the facts contained in the certificate of the architect disputed or in any manner contradicted. The facts surrounding the transaction, and the conduct of the parties proved in evidence tend to show that the truth of the facts therein contained were impliedly admitted, and that Mr. Gleason, at the meeting of the Commissioners, and in the presence of his attorney, Mr. Foster, verbally applied for an extension of time for three days, in which to demonstrate his ability to proceed with his contract. This is not only shown by the record of the Commissioners, but sworn to by two witnesses, and not denied by any one except Mr. Gleason, and he admits being at the meeting, and that the extension was granted to him, as claimed, and that he acquiesced in the same, and does not claim to have made any refutation of the charges against him.

And when the second notice of the Commissioners, terminating the contract, was read to Mr. Gleason by Mr. Reeves, on the 19th, he still makes no denial of the facts recited, neither asserts his ability to proceed nor objects to the form of the notice, or to the certificate of the architect, but voluntarily, and without a single protest, surrenders possession, under the contract, and walks out

and never goes back to do any further work on the build-ings or offers to do so.

While there is a conflict in the evidence, after a care-ful consideration of all the evidence, the conduct of the parties, as shown by the evidence, also the fact that the liens filed by the sub-contractors and material men amounted to more than the estimate allowed to the contractors upon this last occasion, we are of the opinion that the certificate of the architect was true, and that the facts warranted the Commissioners in taking charge of the buildings and completing them as provided in the contract. And when the claimants voluntarily turned over the buildings to the Commissioners without protest or objection, and permitted them to complete them without any intimation that the facts recited by the architect were not true, or that the certificate of the architect or the notice were not sufficient to warrant them in taking possession, they impliedly admit such facts and should be estopped from denying either of them after the Commissioners have taken charge and finished the buildings.

From the books of the Commissioners and other evidence it is shown that the State has spent about $57,000 in excess of the Gleason contract in finishing these buildings. Claimants insists that it was not necessary to have expended so much in order to finish them, and seek to show by estimates that it could have been done for less.

But taking the most favorable showing which is con-sistent with evidence, we cannot see how the claimants could have been benefited by being permitted to complete the contract, so far as receiving any additional amount of money is concerned. It is conceded that there had been paid to Gleason & Son on the original contract ............................... $91,943.64
There was due the sub-contractors of Gleason   57,594.48
Amount shown to be due material men of
Gleason, May 19 ..................... 4,244.44.

Take the estimate of Mr. Mace, a witness for the claimants, and exclude all items which would fall under the contract of either the sub-contractors, and he shows it would require to complete the building the sum of    20,717.40

Making a total of ................... $174,559.96

This would make the buildings cost the State something like $20,000.00 more than the original Gleason contract. This is all from the showing of the evidence of the claimant except the $4,244.44 which was claimed to be paid to material men of Gleason & Son, which was due them when they quit the works on May the 19th, 1899.

Claimants demand $19,518.85 for extra work done on the four buildings. The evidence shows that the architect allowed the sum of $7,815.19 to the contractors for extra work, which was paid to them. And Mr. Wilson, Mr. Reed and Mr. Reeves all testify that while the claimants made several complaints about the estimates of the architects on the original contract being too small, they made no complaint whatever about any of the extra work, except the smoke stack.

Under Article III of the contract, claimants, if not satisfied with the value of the work fixed by the architect, should have caused the same to be arbitrated, and having failed to do so, are presumed to have been satisfied and are bound by the allowance of the architect. Payments were made upon all of these extras, upon the certificate of the architects. The contract making him the judge of whether any work or material was an extra, and of the amount which should be added or deducted from the contract for such change or addition, the claimants are bound by his certificate. They had the right to appeal to arbitration if they thought they were not fairly treated. And having failed to do so, they can neither claim that certain work should have been considered an extra which the architect did not so consider, nor that a

larger sum should be allowed than was allowed by the architect.

In the case of *Gilmore* v. *Courtney,* 158 Ill., 432, the court uses the following language:

"Where parties to a building contract agree upon an arbitrator to settle disputes, and where the contract provides that no money is payable thereon except upon the certificate of the architect, the decision of the arbitrator is final, in the absence of fraud or mistake. In *Snell* v. *Brown,* 71 Ill., 133, this court laid down the rule as to what is sufficient fraud to reject an architect's decision under such a contract. It was there held that where a person voluntarily enters into an agreement that a third person shall estimate work done and pass upon its quality, with power to reject and condemn all material, which in his opinion does not conform to the contract, he cannot avoid or disregard it, except for fraud clearly proved."

The court further says in the case of *Snell* v. *Brown,* 71 Ill., on page 143:

"It is true his conduct may be impeached and his estimates set aside for fraud; but fraud cannot, as is assumed in this instruction for appellees, be presumed merely because his estimates for work done pursuant to the terms of the contract are less than the measurements actually done. Even if he by mistake in judgment, err in condemning or rejecting work, it would be no ground to impeach his estimate."

It was also held that it is not sufficient merely to show that work was rejected or condemned which in the opinion of others should not have been condemned. This may indeed be proved as a circumstance tending in some degree to establish fraud, but it is not conclusive. The evidence must show that the engineer knowingly and wilfully desregarded his duty and rejected or condemned work, which he knew or at least should have known fully conformed in all respects to the terms of the contract.

We do not find from the evidence in this case that the architect Reeves acted fraudulently, and even if there

had been no appeal permitted from his decision, his rulings would govern. But in this case claimants were not compelled to rely upon the decision of the architect; under the provisions of the contract if not satisfied, they had the right to appeal to three disinterested arbitrators. And having failed to do so, they can not now be heard to question the rulings of the architect.

We do not think there is anything in claimants' demand for $1,300 for revising and designing iron plans. From the evidence of Vanderkloot, the secretary and treasurer of the South Halsted Street Iron Works, it appears that the plans in question were prepared by the engineer of said Iron Company, and that no charge was made for same against Gleason & Son.

Neither do we think their claim of $4,160.00 for extra iron should be allowed. It does not appear from the evidence that the iron furnished by the South Halsted Street Iron Works was in fact heavier than the iron called for by the original plans which the Iron Company submitted to the architects, and was rejected by them for the reason that it was too light. And when the plans were approved by the architects, with an increased weight over that first submitted to them the Iron Company required Gleason & Son to pay them an additional sum of $1,100 which Mr. Vanderkloot testified was for this increased weight, and not for designing iron plans.

It does not appear, however, that this was an increased weight over the original plans; and the plan upon which the first bid of $25,000 was made was never approved by the architects, but on the contrary when first shown to them was rejected, and it was changed and made to comply with the demands of the architect. No claim or pretense was made that it was an increase over the original contract and specifications, or that the contractor was entitled to an additional allowance for this increase. In fact the change which was made in the iron plans was made at the solicitation of the Gleasons and no extra allowance was allowed by the architect for an increase,

or even asked for by the claimants, so far as the evidence shows.

The architect now claims, and it is also sworn to by another witness, that the iron substituted for that called for in the original plans and specifications, was in fact much lighter, and that the State is entitled to a deduction from the contract price.

It is, however, clear to the Commission that neither party to the contract, at the time, expected that any allowance should be made, either in favor of the claimant, or a deduction made in favor of the State; otherwise there would have been a computation and allowance asked for from the architect and if either party was not satisfied with his award, they would have appealed to arbitration, as provided in Article III of the contract. No claim seems to have been made for any of these amounts until long after the Gleasons had suspended work on the building.

Claimants' demand of $18,207.00 for increased cost of doing the work in the winter months is not sustained by the evidence. We do not find from the evidence that claimants have clearly shown that the delay in commencing the work was the fault of the Commissioners, or of any person employed by them. But if delay had been caused by default of the Commissioners or of any person employed by the Commissioners to make the necessary excavations, as contended, claimants should have proceeded under the provisions of Article VI, to have had their time extended, and under the provisions of Article VIII to have the architect estimate the loss or damage which they had sustained by reason of such failure of parties to make the excavations in proper time. And if not satisfied with the allowance of the architect, they should have appealed to arbitration as provided in Article III. Not having made any such demands at the time, the inference is that claimants did not then think they were entitled to any such claim.

While it does not appear from the evidence that the claimants have ever sought to regain their working plant, still if the State has appropriated same, they would be entitled to an allowance for what it was reasonably worth. Also they would be entitled to a reasonable allowance for the parts of the water plant which the State has appropriated. This from the evidence would be a small sum.

But from the view which the Commission takes of the case, it is unnecessary to pass upon the question as to what would be a proper allowance for the claimant for these items. Neither is it necessary to determine the exact amount which the Commissioners have paid in completing the buildings in excess of the amount which is due the claimants on the original contract and all special claims which they are entitled to in this case for the reason that this Commission has no jurisdiction to make an award in favor of the State against the claimants for any amount which the Commission might determine is due the State from the claimants.

The Commissioners are of the opinion that the amount which the Commissioners paid for completing the buildings is much more than all sums due the claimants on the original contract, for special work, or for any of the other demands, which the claimants have filed in this case.

We therefore find that claimants are not entitled to any award in this case against the State of Illinois, for any sum whatever, and the claim is therefore rejected.