<hr />

(No. 79-CC-072)

PORA CONSTRUCTION COMPANY, an Illinois Corporation, Claimant, *v.* CAPITAL DEVELOPMENT BOARD, a body politic and corporate, Respondent

*Opinion filed November 9, 1984.*

O'BRIEN & O'ROURKE and PETER PETRAKIS, for Claimant.

NEIL F. HARTIGAN, Attorney General (JAMES A. KOCH, Assistant Attorney General, of counsel), for Respondent.

HOLDERMAN, J.

The final hearing on the above-entitled claim was held on June 13, 1983, in the Court of Claims hearing room, 188 W. Randolph Street, Chicago, Illinois.

From the evidence introduced at the hearings it appears that in February of 1975, Claimant, Pora Construction Company, entered into a contract with Respondent, Capital Development Board, to act as general contractor in the construction of Phase II of the Morraine Valley Community College (MVCC). This was an addition to an existing college facility, which had been Phase I. The contract price was initially $5,156,626.00.

The addition to be constructed by Pora consisted of two two-story structures, connected by an enclosed bridge, as well as adjacent parking areas, landscaped areas, walkways and the like, all totalling approximately 199,000 square feet. The buildings were to include classrooms, laboratories, study units, computer areas and a library.

For construction purposes, the project was designated by area and by various unit numbers. The building which was to connect to the two existing MVCC facilities and which therefore would be put to use first, was designated Units 3 and 5. The other building was labelled Units 1 and 2. The enclosed bridge between the two buildings, which was to connect with Units 3 and 2, was to be Unit 4. Unit 4 was to span a scenic drive running north and south through the campus, which had theretofore been a public highway known as 88th Avenue.

Caudill Rowlett Scott (CRS), a Houston, Texas, firm, was appointed by CDB to act as its archi-

tect/engineer (a/e) for the MVCC project. According to article 2 of the general conditions of the contract documents, CRS, as a/e, was to provide general administration of Pora's contract, to interpret the contract, to judge Pora's performance, to accept or reject work, and to act as the owner's representative with respect to the project. Accordingly, as the owner's representative, CRS prepared and published the plans and specifications for the project. The CDB, as owner, had authority to stop the work, or any portion thereof, and was responsible for promptly furnishing all surveys, easements, information and instructions, pursuant to article 3 of the general conditions.

Pora, as required by article 4 of the general conditions, submitted an estimated progress schedule of the entire MVCC project for the a/e's approval, indicating dates for starting and completion of all stages of construction. According to that schedule, based on the plans and specifications as originally provided by the owner, the project was to be constructed between March 17, 1975, and June 19, 1976, within the 420 days' completion time specified in the contract. A subsequent revision of the schedule extended the completion date to October 1, 1976. Claimant contends that various owner-caused delays caused a job overrun of Pora's work for approximately eight months from this extended completion date.

Pora's plan of construction anticipated a certain orderly and logical sequence to the construction of the Phase II facility. As a result of meeting with representatives of the college, it was decided that the building designated Units 3 and 5 would be completed and ready for occupancy first, as it was the building adjacent to the existing facility. Work would then proceed in steps

progressing away from the existing college, with the bridge next and finally the other building (Units 1 and 2). The specific construction sequence, then, was to be 5-3-4-2-1.

As a result of various delays occasioned by the alleged action, omissions and changes by the CDB, the final completion of Pora's work under the contract, as amended from time to time, occurred approximately 242 days after the completion date, as extended. Those alleged owner-caused delays were the focal point of the evidence adduced in this case. It is claimed, that as a result of the alleged owner-caused delays, Pora's work schedule was altered and impeded to such an extent that Pora incurred $379,045.00 of compensable damage flowing directly from the impact of the delays and obstructions caused by the CDB.

The complaint in this case specifies the manner in which several separate actions or omissions of CDB combined to cause delay and unwarranted expense to Pora and alleges actionable breaches of express or implied covenants of the contract between Pora and CDB. Specifically, the four contractural breaches, and therefore the four legal issues involved herein, were as follows:

1. A breach of the implied warranty of the accuracy and sufficiency of the plans and specifications;

2. a breach of the implied covenant to facilitate the progress of the work;

3. a breach of the implied warranty of access to the job site; and

4. a breach of certain express provisions of the general conditions of the contract.

In the present situation the contract documents did not set a fixed time for completion but required the contract to be completed in 420 days. The length of the contract was established by the Claimant. The contract

reserved the right to CDB to stop work, change specifications and reject the work of the contractor. (Sections 12.1 and 2.2.12 of the general conditions.) The contract documents provided that if the Respondent exercised its rights previously stated or if delay in the progress of the work was caused by the Respondent, then the contract would be modified by extending the completion time of the contract and/or adjusting the contract price for any changes or delays. This project also ran into unexpected bad weather, unfavorable soil conditions and changes in the specifications.

The Claimant in the present case did modify the contract by using the change order provisions of the contract. Claimant is now requesting additional compensation for costs due to the delay and damages caused by the decrease in labor effectiveness because the work was done in winter months.

Claimant is claiming reimbursement for additional costs it claims it sustained as a result of lack of accessibility to the site; problems concerning the removing of certain telephone and Commonwealth Edison lines and poles; delays to work as a result of pile driving difficulties; delay due to switchgear revision and elevator installation; and also delays due to handicap ramp installations and the revision of the expansion joints to be used in the concrete.

When Claimant began driving piles it was determined that more soil tests were needed. This caused some delay. The job site was intersected by a heavily travelled highway known as 88th Avenue, which road was not vacated prior to the start of construction. This caused some inconvenience to the work progress on the project. The same applies to the delay in the removal of

the telephone lines and poles and the electric lines and poles which were situated on the job site.

The switchgear to be used in the building had to be reordered. This caused some delay. A delay was also occasioned by a change in the plans calling for the installation of an elevator and handicap ramps. Intermingled with the delays and contributing thereto was extremely bad weather which caused a delay of 56 days out of the first three months. Certain other delays were also encountered, some attributable to the Respondent, and some to the Claimant. As a result of the delays the project was pushed into the winter of 1976-77. The winter weather caused a slowdown of the work. It further necessitated installing temporary heat and the enclosing of the buildings so that the inside work, including the electrical, plumbing, heating and carpentry work, could be done.

Claimant seeks to recover for what it calls its direct field costs. It also seeks to recover for its alleged indirect cost consisting of home office overhead covering the overrun of 242 days which it claims amounts to the sum of $72,827.00. For the direct costs and indirect costs, Claimant seeks a total of $369,045.00.

It is next to impossible to directly pinpoint the delays and the responsibility therefor and to assess the items of damage directed thereto as claimed by the Claimant. There is further a contention by Respondent that Claimant should have been compensated only through the submission of change orders and the approval thereof by the architect/engineer, or in failure thereof by arbitration in accordance with the terms of the contract.

The Respondent's contention is that the delays

caused by changes in specifications and other events resulting in delays in the progress of the work were not breaches of the contract which provided that "the owner without invalidating the contract may order changes in the work. . . ." It further argues that any delays were also covered by the contract provisions to the effect that through change orders the contract price can be adjusted and an extension in time to perform can be given if Claimant is delayed and suffers a loss because of it. Respondent states that while Claimant has been paid the contract price adjusted by many change orders it seeks additional compensation because of alleged delay damage not recovered through the change orders.

On this point Claimant's position is that its claim for delay damages differs from the change order situation, which procedure, it says, is to compensate for work which was not originally specified and does not include the "impact of a change". Impact damages are unascertainable at the time of a change order and, Claimant argues, the change order procedure cannot deal with delay claims. It agrees that there is a situation when delay claims cannot exist and that is when the contract includes specifically a "no damage for delays" clause which wasn't the case here.

This issue of the case was very extensively and ably briefed and argued by both sides. Resolution of this issue is not without difficulty. The Respondent cites *Gleason v. State* (1902), 1 Ill. Ct. Cl. 233, where it was held that Claimant was not entitled to delay damages because it should have proceeded under the contract to have the contract extended and adjusted for the delay. Further, Respondent relies on *United States v. Rice* (1942), 317 U.S. 61, where the court held delays in the project could not be considered a breach of contract

since the contract provided the government had power to alter, suspend and change the contract.

In answer, Claimant contends that *Gleason* is no longer the law of this State in light of the evolution of the theory of delay damages. In answer to *Rice*, Claimant states it deals with interpretation of *Federal* procurement contracts, that it has been criticized even in Federal courts, and that it is not the law of this State.

This Court is of the opinion that while change orders do take into account delay costs, that notwithstanding, there can be and were delays occasioned by Respondent which could not and were not included in the change order procedure. The real difficulty however is assigning culpability for each delay when part of it could be attributed to the weather, part of it could be attributed to Respondent, part attributed to Claimant and part of it included in the change orders. We do not believe it possible to separate each delay into one specific category solely in every instance nor to mathematically, with any accuracy, dilute the alleged delay damages by such delay factors as may have been included in specific change orders for which Claimant has been paid.

Respondent contends that if damages were its responsibility at all, they should be limited to 49% of amount claimed, as the balance would be attributable to the weather or to Claimant's own fault. There is some merit in Respondent's contention. Certainly the weather was a contributing factor and certainly some portion of the delays were covered by the change orders.

The thrust of Claimant's claim is to a great extent based on the damages caused by the interruption of its planned sequential performance brought about by the

various delays. Respondent argues that all this could have and should have been handled by resorting to change orders. It seems to us, however, that much of the impact damages could not reasonably be anticipated at the time of the change orders. In addition, the change orders didn't cover every delay.

The overlapping of the various delays both in cause and in damages makes it impossible to isolate the exact amount any particular delay caused. The whole has to be considered in preference to an itemization, while the latter must be given such consideration as is ascertainable.

Respondent argues that if damages are awarded they should not include $96,000 in labor costs as they were included in the change orders. There is some merit in this contention as we do not find it unreasonable to expect Claimant to include a labor factor in his change orders at the time they were agreed upon.

A synopsis of the delays shows their magnitude and the impact flowing therefrom.

It appears that 88th Avenue intersected the site of the MVCC project, dividing Units 3 and 5 from Units 1 and 2 and running beneath the bridge of Unit 4. The plans submitted to Claimant indicated that this public highway was to be closed. When Claimant moved in March 10, 1975, the street was still being used and this presented a major problem. The road was not closed until July 3, 1975. During the interim the crew had to work across traffic on 88th Avenue. Also, Claimant had to stop work until it got a permit from Cook County.

Further, there were utility poles present, some on each side of the highway. This caused a great deal of burdensome inconvenience in pile driving and in

moving equipment across the road with utility wires present. The lines were not removed until June 13, 1975, and some not until July 1975. The presence of the poles caused Claimant to undertake drastic changes in procedure from what it had contemplated.

The specifications required piles to reach a 25-ton bearing capacity, but due to the nature of the soil, the pile driving had to be stopped until test borings could be made to determine the proper length to drive the piles. This delay caused the other work to be stopped also, as the pile driving was a necessary preliminary to other construction.

Further, the specifications called for a bearing-plate type of expansion joint made from ruberoid or equal. Ruberoid was not available and a substitute was obtained and used in 16 expansion joints. However, the work was again stopped by owner until the expansion joints were redesigned for prospective use. This error apparently was the fault of the architect in its original set of specifications. Again this caused an interruption in Claimant's continuity of progress and a delay in concrete pouring and other work. The orderly progress of performance being interrupted is the basis of Claimant's claim.

In addition, the switchgear specified caused a problem and was redesigned. Originally it was scheduled to be installed prior to December 1978. This apparently was due to an error in the specifications furnished. The delay in the installation caused an interruption in pouring slabs. It was not until November 1976 that the newly designed switchgear was installed and much of the other construction was dependent on this item. The delay was such a severe departure from

the original anticipated installation that Claimant suffered damages not possible to include in any change order.

Originally there were no handicap ramps specified at the entrances, but a change was made to require such ramps at six entrances. Claimant furnished a proposal on January 14, 1976, for the ramps, but it was not until July 12, 1976, that the details of the ramps were made final. Again the sequential progress of the work was drastically interrupted.

The plans originally called for a pedestrian ramp to the second floor of Unit 3, but no elevator was specified. The contractor was put on hold until the matter could be resolved. The hold direction was March 1, 1976, and applied to "areas affected by the proposed changes." The "areas affected" were not defined, however, leaving the matter suspended in a state of confusion. On April 29, 1976, Claimant was provided with specifications for a hydraulic elevator. It was not until August 18, 1976, that Claimant received a change order for the elevator— 5 1/2 months after the hold order. The delay in respect to the elevator compelled concrete pouring to proceed in the winter of 1976. The six-month delay caused a severe delay in Claimant's orderly progress of performance. Claimant contends this, along with the other delays, was a violation of owner's duty under the contract to facilitate the progress of contractor's work.

Further delay was encountered in contracting for and the laying of carpet. It was planned to start in March 1976, but didn't start until January 1977. Until the carpet was in, other trades could not complete their work—the laboratory furniture work, certain school equipment, access flooring, electrical units and plumbing, all were delayed.

All in all, the magnitude of the delays attributable to Respondent's dilatory practices warrants some recovery by the Claimant. No change order could encompass the impact damages caused by the extensive delays.

Respondent strongly urges that article 8, section 8.3 of the contract's general conditions adequately covers the procedure for time delays.

Section 8.3.1 provides:

"If the contractor is delayed at anytime in the progress of the work by any act or neglect of the owner or the architect, or by any employee of either, or by any separate contractor employed by the owner, or by changes ordered in the work, or by labor disputes, fire, unusual delay in transportation, unavoidable casualties or any cause beyond the contractor's control, or by delay authorized by the owner pending arbitration, or by any cause which the architect determines may justify the delay, then the contract time shall be extended by change order for such reasonable time as the architect may determine."

Article 12 of the general conditions provides for change order procedure, wherein it states that the owner, without invalidating the contract, may order changes in the work and the contract sum shall be adjusted accordingly, and if the adjustment can't be agreed upon it should be determined by the architect. (12.2.1.)

Respondent contends these contract provisions were agreed upon and, according to their terms, any claim not made would be waived.

However, article 7, section 7.6.1 provides that the duties and obligations imposed by the contract documents and the rights and remedies available thereunder shall be in addition to and not a limitation of any duties, obligations, rights and remedies otherwise imposed or available by law.

Therefore, Claimant would be barred were he suing under the contract, but his theory here is that the owner-

caused delays amounted to a breach of contract in interfering with his orderly performance of work.

As stated earlier, Respondent cites the 1902 case of *Gleason v. State, supra.* In that case Claimant's contract had been terminated by the State under applicable provisions of the contract due to failure of Claimant to perform. Thereafter, the State took possession of the buildings and completed the work spending about $57,000 in excess of the *Gleason* contract. Claimant in *Gleason* demanded additional compensation for work done up until the time of suspension of the contract. The suit was in *assumpsit* for the value of work done by Claimant. The Court held that the State was justified under the contract to suspend work by Claimant.

One item of damages claimed in *Gleason* was for delay in work through winter months. The Court denied this, as it said it wasn't clearly shown to be the fault of Respondent, but even if it was, they should have proceeded under the contract terms to have the architect estimate the loss, and if not satisfied, resort to arbitration as provided in the contract. This they did not do. The Court concluded that what the State paid to complete the contract after suspension exceeded any claim the contractor could make.

In *Gleason*, the Court refused to consider the claim because it "wasn't clearly shown" that the delay was the fault of Respondent, and what the State paid exceeded any claim that the Contractor could make. The case seems to support the fact that the contract provided that the proper remedy to pursue was through arbitration if the architect's value of extra work was unsatisfactory. See *Gleason, supra,* 244 *et seq.*

Does *Gleason* actually foreclose Claimant? It's true,

delay damages are expected to be covered by a change order, but weren't the delays such that they wouldn't be expected to be included in a change order? Is there not a breach of contract where the owner's own fault, independent of all others, causes delays of such magnitude that the impact is not possible to calculate? The owner is required not to interfere with the expeditious performance by the contractor. We believe that in this case the owner interfered at least in substantial part. This being the case, the Claimant isn't required to go without a remedy except through approval of the architect.

In this regard our case has a limited application and is confined to a case where the owner's sole conduct so interfered with the work progress that it amounts to a breach of contract.

This holding of the Court is limited strictly to cases where all the following elements are substantiated by the evidence:

1. Where the contract contains no clause which provides there shall be no damages for delays; and,

2. Where the delay is caused solely by the unanticipated fault of the owner without concurring causes; and,

3. Where, the delay damages are not already included in any change order nor, because of their nature and extent, they reasonably can be expected to be included in such change order by either party to the contract; and,

4. Where the damages solely caused by the owner create such an overall impact that they can be said to be a violation or breach of the contract not to interfere with expeditious performance of contractor.

Claimant is awarded $240,000, based on 65% culpability applied to total damages of $369,045.