(No. 81-CC-2466-

GUARANTEE ELECTRICAL CO., Claimant, *v.*
THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 30, 1991.*

*Order filed June 18, 1991.*

ARMSTRONG, TEASDALE, SCHLAFLY, DAVIS & DICUS, RON SCHARF and GILLESPIE, CADIGAN & GILLESPIE, for Claimant.

ROLAND W. BURRIS, Attorney General (WILLIAM WEB-
BER, of counsel), for Respondent.

## OPINION

Montana, C.J.

The Claimant, Guarantee Electrical Company, brought this claim seeking $457,933.28 in damages incurred due to delays and other problems encountered in the performance of a construction contract with the Respondent's Capital Development Board (hereinafter referred to as the "CDB"). The case was tried over many months by the commissioner assigned to the case. The cause was consolidated for trial purposes only with claims by Lippert Brick Contracting, Lowry Electrical Company, and K & S Associates, Inc.

On August 1, 1978, the CDB entered into a contract with Claimant in which Claimant agreed to be the

electrical contractor for the construction of two of the three buildings in the East St. Louis Community College project. The project consisted of the Skilled Training Center, the Academic Building, and the Learning Resource Center. Guarantee Electrical Company worked on the Academic Building and the Learning Resource Center. The project was scheduled to begin in August of 1978 and be completed in 730 calendar days and by August 30, 1980. Time was of the essence in the contract documents. The CDB gave Claimant bid documents and drawings upon which Claimant testified it relied in computing its bid and planning its work. With these documents and using the customary construction and bidding practices, Claimant's bid including some change orders, was $505,090.00 and is documented in Claimant's Exhibit No. 265.

In fact, the project was finally completed in about 1330 calendar days. Claimant alleged that it was prevented from completing its work within the contractual 730 days due to delays not attributable to Claimant and that Claimant incurred actual costs of $963,023.28.

The Claimant, upon acceptance of its bid, was ready, willing and able to perform. The CDB, in August of 1978, told the contractors to begin the project and authorized the contractors to proceed pursuant to Exhibit 23, the authorization to proceed. Claimant asserts it performed its work under very adverse project conditions and was not responsible for any material delays.

It is apparent from the entire record that Guarantee Electrical Company caused no material delays on this project. The CDB had the obligation to obtain an excavator to begin the project. The project was to start

on August 30, 1978. The CDB was unable to obtain a qualified excavator and the excavation was still incomplete over a year after the project began. The CDB's utter failure to have the excavation start on time and continue was a major problem for over a year and was one of the major delays on the project. Because of the excavation problems, all of the project schedules were off from day one. This had a snowball effect as the delay caused the project to go through four winters rather than the scheduled two winters. Once the project was delayed by the excavation problem all of the coordination and sequencing was out of sync and the architect/engineer ("A/E") and general contractor were not able to get the project back in sync.

Claimant did everything it could do. It notified the CDB of the delays due to no excavation, the problems of not being able to work outside in the winter, the problems of lack of heat in the buildings, and other problems. The CDB was unable to clear up these problems and the project was delayed almost two years beyond its scheduled completion date for the entire project.

Other acts of the CDB caused substantial delays on this project. The normal CDB project has five prime contractors. The East St. Louis Community College project was broken down to thirty-six prime contractors by CDB to obtain minority participation. CDB officials acknowledged that this number of contractors required increased coordination which the (A/E) and general contractor chosen by CDB were unable to perform. CDB did nothing to rectify the inept coordination even after it was apparent the A/E and general contractor were not up to the job. Another long delay was that the structural steel did not go up in time. The building was

not enclosed on schedule so during the second winter the electricians could not work. There was no steel decking on the second floor and roof which caused delays. There was no heat, ice was on the floors, and the building was not weathertight, all of which caused delays. Also, there was no proper sequencing of the trades or proper coordination. Paperwork was not timely processed. There were many CDB personnel changes as the CDB had five different project managers on this project. All of these factors also caused delays.

Once the excavation problem got the project off to a horrendous start, the compression of the schedule caused increased costs and because K & S, the general contractor, failed to provide realistic schedules on time, the sequencing was out of sync. Electricians are at the mercy of the other trades. To be efficient, the electricians need to put in their conduit before other trades do their work. Here the scheduling was so bad that Guarantee was prohibited from efficiently doing its work.

Other delays were caused by the CDB failing to have some of the contractors be prequalified. The original excavator, Eanes Excavating, was unable to obtain a performance bond. Later, rather than obtain a qualified excavator, the CDB change ordered Eanes to work as a subcontractor to K & S, the general contractor. It then became apparent that Eanes just could not do the job. By then months and months were lost and the project was in real trouble. With the number of prime contractors on this project, coordination meetings should have been held once a week. They were held once a month. The CDB was to have people at the meetings with authority. The project managers did not have authority to act on the questions raised at the

coordination meetings. Often no decisions on problems were made for months.

In Exhibit 274, the contract documents in Paragraph D state:

"The contractor will not be entitled to any claim for delays or compensation from the CDB on account of any delays except that the contract sum will be adjusted for delays caused by the CDB, the architect/engineer, or the construction manager in the administration of this contract when such delays are for an unreasonable period of time caused by the acts of CDB."

Most of the preceding delays and particularly the excavating delays are attributable to the CDB. The A/E caused delays by failing to get shop drawings to the contractors on time. Six months after the job was to have started, they were still calling for shop drawings.

The testimony is devoid of any blame for delay on Guarantee Electrical. In fact, CDB officials testified Claimant did good work and was not responsible for delays. As previously stated, this project was unusual in that the CDB usually has five prime contractors. In the instant case, they had 36 prime contractors so that minority contractors could be used. Such a situation required great coordination skills which were not apparent in the CDB, the A/E, and the general contractor. Once the excavation did not proceed as scheduled, the entire project was ill-fated. The CDB failed to take appropriate steps to obtain a competent excavator and the project suffered. CDB officials admitted it was their obligation to obtain an excavator. The CDB was a major cause of the delay in allowing the excavation problem to continue so long, having an A/E not up to the job, and failing to terminate K & S Associates, Inc. when it became painfully obvious that the general contractor could not sequence the job once it got off to the bad start.

It is also obvious that the Claimant could not proceed with its electrical work until certain other phases of the construction were completed. There was no evidence that this Claimant contributed to any of the delays. The CDB gave Claimant passing marks in its evaluations. There was evidence that the Claimant notified the CDB in writing that delays were occurring and costs were mounting. The CDB was warned by Claimant of the impending wage increases. Other letters by Claimant to CDB document the delays and cost increases.

Claimant's contract was with the CDB. The CDB has the primary responsibility for making the worksite available to the contractor in time for the contractor to do the work. As owner, the CDB is legally liable for the delays and resulting damages. (*Pora Construction Co. v. State* (1984), 37 Ill. Ct. Cl. 54.) The fact that the CDB separately contracted with other entities who may be to blame for the delays is of no consequence in this action. If the CDB is damaged by the actions it attributes to others, it may pursue those it believes caused the damage. Under circumstances as are involved here, where all the parties to the contract cannot sue each other in one forum, this result must obtain. The court stated in *J.F. Inc. v. S.M. Wilson & Co.* (1987), 152 Ill. App. 3d 873,

"This court finds that if the owner failed to make the site available to the contractor in time for the contractor to do its work, the contractor may sue the owner. (See *W.H. Stubbings Co. v. Worlds Colombia Exposition, Co.,* (1903), 110 Ill. App. 210.) In this case, the prime contractor may sue the State in the Court of Claims (Ill. Rev. Stat., 1983, ch. 37, par. 439.1 *et seq.*) for its failure to properly supervise the construction project. (Ill. Rev. Stat., 1985, ch. 127, par. 780.04.) Even if the contract contained a no damage for delay provision, a prime contractor may sue and recover from the owner for delay damages caused by another prime contractor. (*United States Steel Corp. v. Missouri Pacific R.R. Co.* (1982), 668 F.2d 435.) Thus, the appropriate procedures for a prime contractor are change orders and possible lawsuit in the Court of Claims."

Most if not all construction projects will have delays of one form or another. Those projects with multiple contractors calling for coordinated efforts are more likely to have delays. For a delay to be tolerated, it must be reasonable under the circumstances. The delay on this project was considerable and certainly beyond reasonable. The CDB has tried to put blame on the other contractors but has shown absolutely no excuse for the initial cause of the delay, the lack of an excavator on the project.

The Respondent defends by arguing that the starting and completion dates were provisional and did not impose a duty upon the owner to ensure completion by August of 1980. They cite *Edwards Construction Co. v. Illinois State Toll Highway Authority* (1975), 34 Ill. App. 3d 939. The *Edwards* court held that the owner was not liable for delays caused to a second phase contractor on the basis of a schedule that did not afford the plaintiff a prepared work site upon which to perform. The court held that the contract provided a completion date which was provisional and did not impose a duty upon the owner to ensure completion by that date.

In the present case, the entire project was to take 730 days. The project lasted almost four years. The CDB gave authority to proceed in early August of 1978. In bidding the contract, the Claimant only had the completion date to work backward from or a general estimate of when the work of the other contractors would be completed to arrive at an expectation of a starting date. With an actual starting date in August of 1978, the actual delays on the project greatly exceeded anything foreseeable or reasonable. Furthermore, adjustments could not be made as the project very

slowly progressed because the work schedules were never realistic and seldom produced by K & S, the general contractor. Eventually, the A/E had to take over the coordination because K & S could not do the job.

Because Respondent started the job in August 1978, pursuant to an authorization to proceed, and because there was an outside completion date, Respondent's argument in the face of the unreasonable delays is without merit. The Respondent has the responsibility for the damages sustained by this Claimant due to the delays. The State's recoupment action against K & S is the subject of another opinion. However, the damages to Claimant are difficult to ascertain with exactitude. Claimant testified and presented sufficient evidence that its actual labor costs exceeded estimated labor costs. The labor costs sought by Claimant are as follows:

| | Bid | Actual Cost | Delay Claim |
|---|---|---|---|
| Journeymen electricians | $115,581.00 | $291,621.16 | $176,040.16 |
| General foremen & foremen | 78,576.00 | 156,404.00 | 77,837.00 |
| Supervision contract manager | -0- | 32,640.00 | 32,640.00 |
| Labor escalation | | | 43,783.00 |

There was unrefuted testimony that the original bid was reasonable. Claimant's bid was 6.8% under the architect's estimate for electrical work and 10% under the next lowest bidder. The increased labor costs were attributed to wage rate increases, loss of efficiency because of the necessity of stopping and starting work at

various times, and the need to have supervisory personnel on or following the project for 1330 days rather than the 730 days.

With the unknown variable of an exact known starting date at the time of the bid, the fact that some delay is inevitable, and the inherently speculative nature of computing loss of efficiency, the Court finds the losses occasioned by delay for labor costs to be $275,000.00. Admittedly this figure is somewhat arbitrary and the delays were primarily the responsibility of the Respondent but we do not believe that the damages are computable down to the penny as Claimant has tried to show. Even Claimant's expert, Jack Olsen, testified that inefficiency is difficult to quantify. As triers of fact, it is the Court's responsibility to arrive at an amount after weighing the evidence. (See *Neylon v. State* (1985), 39 Ill. Ct. Cl. 65.) We believe that the foregoing finding represents a fair amount. Of this amount of $275,000.00 for labor costs from the delay, a significant amount remains at issue and the Respondent raises a valid argument thereon. The testimony indicates that Claimant is seeking $70,000.00 from Reed for work done by Reed but which had to be done over by Claimant. Because Reed was clearly a subcontractor of Claimant, there was privity between the two. Pursuant to Rule 6 of the Court of Claims, Claimant should have proceeded against Reed for the $70,000.00. There is no evidence of the results of any claim of Claimant versus Reed. Because of the failure to exhaust remedies and because the State should not be responsible for Claimant having to re-do work done by Claimant's subcontractor, the labor delay claim should be reduced by the $70,000.00. *Lyons v. State* (1981), 34 Ill. Ct. Cl. 268.

The Claimant also asserts certain delay damage claims which were related to materials. Claimant seeks

$60,508.38 for additional materials costs and $8,570.28 for material cost escalations due to delay. This increase is offset by $52,467.36 which is subtracted for actual cost estimating bid errors. At the preconstruction meeting, the CDB encouraged the contractors to place orders for materials as soon as possible. Because of the delays, materials ordered by Claimant could not be released by suppliers as Guarantee had no place to store the materials.

The Claimant has provided adequate proof of additional actual costs for materials over their bid estimates. However, like the labor costs, the material costs are subject to the same unknown variables stated heretofore in this opinion. In addition, CDB was not required to store the Claimant's materials. Therefore, we find the Claimant's losses for materials occasioned by delay to be $12,000.00. Admittedly this figure, too, is somewhat arbitrary but we do not believe the damages are easily figured particularly with the unknown variables aforesaid, the lack of a duty upon Respondent to store the materials, and with the requirement and encouragement of the CDB to purchase materials early in the project. We believe that the foregoing amount represents a fair amount for damages for delays related to materials.

Claimant further seeks $46,209.05 for tools and other job expenses. Claimant's testimony and exhibits fail to specifically show just how this figure of $46,209.05 is determined and more importantly how Respondent is liable to pay the same. The evidence is not sufficient to show the State's liability for $46,209.05 for tools and other job expenses. The State was not responsible for security on the job and the poor estimating is the responsibility of Claimant. The claims for other job expenses

are denied based on the foregoing lack of State responsibility and proof of damages. Claimant's expert, Jack Olsen, testified that he was familiar with Claimant's claim for tools and other expenses. They have a piece of equipment and depreciate it over a certain period of time, add escalation to that for replacement, and then they charge that piece of equipment out on an hour, half-day, whole-day or weekly basis. That way they have monies coming in that will be used to replace that item of equipment or material. While the expert was familiar with this process as to this one area of damages, he did not testify the claimed amount was reasonable. Spencer Woodale testified for Claimant that this claim related to company-owned tools, the rental rates that are charged and that those rental rates cover the cost of maintenance, upkeep and their depreciation. They used AGC rental rates, the standard rental rates for tools. The only substantial damages are the indirect damages for tools at $367.00 per week for 38 weeks totaling $13,946.00 and such damages will be allowed. The "other expenses" were not properly substantiated and are not allowed.

The Respondent contests Guarantee's claim for profits citing *Egizii Electric v. State* (1973), 32 Ill. Ct. Cl. 93. *Egizii, supra,* does not stand for the proposition espoused by respondent. That case states that "where a party to a contract has caused a breach, that party is liable for the increased costs and damages directly and proximately caused by such breach." The State stipulated to the damages in that case and profits were not an issue. The Court of Claims has awarded damages for profits and overhead in delay cases. (*J.F. Inc. v. State* (1988), 41 Ill. Ct. Cl. 5.) Indirect damages such as overhead and profit are appropriate measures of damages and the Court should allow such damages. (*Johnson v. State* (1973), 39 Ill. Ct. Cl. 36.) In the present

case, Claimant's testimony indicates the 16.5% of the amount of damages found to be reasonable herein.

The damages proven by Claimant for increased wages paid, materials and overhead, as heretofore found by the Court, were reasonable.

In summation, the Claimant has suffered damages in the following amounts:

| | | |
|---|---|---|
| Labor claim | | $205,000.00 |
| Materials Claim | | 12,000.00 |
| Tools Claim | | 13,946.00 |
| Subtotal | 230,946.00 | |
| × Overhead Percentage | × .165 | |
| Overhead | | 38,106.00 |
| Total Damages | | $269,052.00 |

Two questions remain. The Respondent raises the public policy issue that the actions of the State to try to keep Eanes Excavation on the job as a minority contractor was an important public goal and this excuses the State from delay claims caused by this important public service. The argument is that a public policy goal was minority business participation in State contracts. In this case, Eanes Excavating could not obtain a performance bond. Later, working under a change order through K & S, the general contractor, it became obvious that Eanes could not do the job. The Respondent argues that the CDB took its actions to try to keep the minority contractor working for good cause and its actions were consistent with a strong public policy, and that to penalize the State for adherence to this societal goal would effectively contravene public policy. Even if it is assumed that this is a valid defense, and we do not find that it is, we are not convinced that the goal could

not have been met with other means. While the goal was laudable, these contractors should not be the sole bearers of the cost of reaching it. The only ones penalized here are a few contractors who the State wants to be left holding the bag. These contractors continued to work on the word of the CDB officials that they would be treated fairly. The State cannot be penalized because it is not the State's money that will be used to pay Claimant. The money comes from all the taxpayers in the State. If anyone should be "penalized" as Respondent suggests, then all the people should pay to spread the cost to all taxpayers for the public purpose.

Finally, the question of entering an award remains. This Court cannot enter an award unless sufficient funds remained released and unexpended in the appropriation made to fund the project. See discussion in *Loewenburg/Fitch Partnership v. State* (1986), 38 Ill. Ct. Cl. 227 and *Ude, Inc. v. State* (1982), 35 Ill. Ct. Cl. 384. The transcripts in these joined cases are in excess of 3100 pages. The exhibits number in the hundreds and include hundreds if not thousands of pages of information related to the cases. In the Court's review of the testimony and exhibits, no concrete evidence is found concerning any exact amounts of released and unexpended funds from the project. There is some evidence, although it appears to be hearsay, that the State was to fund 75% of the project and the user, East St. Louis Community College, was to fund 25%. Local funding had been an initial problem which caused the project a late start on bidding in the summer of 1978. There was also some testimony by CDB officials that there was no money available to pay any delay claims and that no delay claims were ever paid on this project. There was also some testimony about a contingency fund but nothing concrete enough for the Court's purposes.

Before entering judgment for the Claimant or making a recommendation to the General Assembly, we will need the fiscal data including the balance of released funds which lapsed at the conclusion of the project. Respondent is ordered to file said information within fourteen days.

## ORDER

These cases come on to be heard following the Respondent's response to the opinions entered herein on May 30, 1991, and the Court being advised;

In the aforementioned opinions the Court found that each of the Claimants suffered damages but refrained from actually awarding the damages pending the Respondent's submission of the fiscal data on the remaining balances of funds appropriated for the two projects. The Respondent has promptly complied with the directive and the claims are again before us.

The Respondent's reply is accepted as *prima facie* evidence of the facts contained therein pursuant to 74 Ill. Adm. Code 790.14. Respondent stated that a total of $19,879.00 lapsed in Appropriation Account Code Number 141-51184-4470-28-78 for CDB Project Number 810-029-001, the East St. Louis Junior College and VoTech. On the Community College of East St. Louis project, No. 810-092-001, the Respondent stated that $88,762.62 lapsed in three separate Appropriation Account Codes, 141-51184-4470-28-78, 141-51184-4470-60-75, and 141-51184-4470-60-79. One Appropriation Account Code, 141-51184-4470-28-78, is listed under both projects. This appears to be an artificial separation made by the CDB. In appropriating funds for the project the General Assembly apparently did not so designate the money or else it would have made separate appropriations. The

Court sees no reason that this money should not be comingled. However, an insufficient amount of funds lapsed to cover all of the damages.

As indicated in the prior opinion, it is this Court's policy in breach of contract claims to limit awards so as not to exceed the amount of funds, appropriated and lapsed, with which payment could have been made. To do otherwise, *i.e.*, to award money for debt incurred beyond the sum allotted by the General Assembly, would be tantamount to granting a deficiency appropriation. The appropriation of State funds is the constitutional prerogative of the General Assembly. It is the Court's duty to uphold that process. It is also the Court's duty to advise the General Assembly. (*Thorlief Larsen & Son, Inc. v. State* (1990), 42 Ill. Ct. Cl. 195; *Mary B. Bojko v. State* (1988), 41 Ill. Ct. Cl. 202; *J.F. Inc. v. State* (1988), 41 Ill. Ct. Cl. 5; *Loewenberg/Fitch Partnership v. State* (1986), 38 Ill. Ct. Cl. 227; *Ude, Inc. v. State* (1982), 35 Ill. Ct. Cl. 384.) Further, where there are several Claimants vying for the same lapsed funds and an insufficient amount lapsed to cover *in toto* all of the damages suffered, it is this Court's policy to make awards on a first in first out (FIFO) basis. *Thorlief Larsen & Son, Inc. v. State, supra; Board of Trustees of Southern Illinois University v. State* (1988), 40 Ill. Ct. Cl. 146; *Aurora College v. State* (1985), 37 Ill. Ct. Cl. 321.

Among the four claims at bar, that of Guarantee Electrical Company was filed first. Guarantee suffered damages totalling $269,052.00 as a result of contract breaches on CDB Project No. 810-092-001 only. The total amount of lapsed funds on that project was $88,762.52. As previously pointed out, the lapsed funding for the other project should also be considered because it is one and the same appropriation. The

$19,879.00 will be added for a total award to Guarantee of $108,641.62.

The allocation of all of the lapsed funds to Guarantee on the FIFO basis renders moot which contractor filed next as the funds are exhausted.

For purposes of potential consideration of these four claims by the General Assembly and in fulfilling our role as an advisory body to the General Assembly we reiterate our finding in the prior decisions and point out that but for the insufficient amount of lapsed appropriations on this project we would have made the following awards of damages:

1. Guarantee Electrical Company—$160,410.38 (over and above the award to be made herein-below)
2. Lowry Electric Company—$18,975.00
3. Lippert Brick Contracting—$22,376.81
4. K & S Associates, Inc.—$264,137.56

Accordingly, it is hereby ordered that Guarantee Electrical Company be, and hereby is, awarded the sum of $108,641.62 and the other claims are denied solely for the reasons stated herein.