50

(No. 86-CC-0870–)

FRU-CON CORPORATION and GRANITE CONSTRUCTION, known as the JOINT VENTURE, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed January 17, 1996.*

JENNER & BLOCK (JOHN SIMON), Counsel for Claimant. GREENSFELDER, HEMKER & GALE (LARRY B. LUBER, Add'l of counsel), for Claimant.

JAMES E. RYAN, Attorney General (RONALD A. ECKERT, Special Assistant Attorney General, of counsel), for Respondent.

## OPINION

FREDERICK, J.

In 1965 the Illinois Department of Transportation hired the engineering company of Alfred Benesch & Company of Chicago to perform design and engineer work for a new interstate bridge over the Mississippi River at Jefferson Barracks, Missouri, south of St. Louis. The bridge would connect Interstate 270 between Illinois and Missouri. The planning phase for this bridge had originally begun in 1963 when Missouri and Illinois agreed to the construction of the bridge. Prior to 1963, there existed a bridge at that location which had been constructed in 1941, consisting of two lanes and which was becoming obsolete. In 1968, the Benesch Company prepared engineering drawings which were based on the concept of constructing a new two-lane substructure and bridge for westbound traffic, and utilizing the existing bridge for eastbound traffic. The work on this plan ceased in 1972 when a decision was made to build a completely new six-lane two-span bridge. This decision caused the Benesch Company to change direction and design a completely new bridge structure, the construction of which ultimately forms the basis of this claim. The new bridge was to be a cooperative effort between the Illinois Department of Transportation and the Missouri State Highway Commission. Illinois was to take the lead for the design and construction of the new bridge. On April 26, 1977, the Illinois Department of Transportation ("IDOT") issued a bulletin notifying potential contractors that IDOT would take bids in June of 1977 for the construction of the substructure for the Jefferson Barracks Bridge. This bulletin indicated that plans and proposal forms were available to contractors upon request.

The Fru-Con Corporation is a St. Louis-based national construction company. It was involved in the construction

of Busch Stadium in St. Louis, the Equitable Building in St. Louis, Interstate 70 in St. Louis, and the I-70 bridge substructure over the Missouri River in St. Charles, to name but a few of the projects on which this company has worked. The Granite Construction Company was a California-based company which has been in existence since 1922. While it does do business across the country, its primary work area is the western region of the United States. On June 13, 1977, Fru-Con contacted Granite to ask for its participation in the bidding process. These two companies constitute what is hereafter referred to as the "Joint Venture" in this litigation. The representatives of these companies entered into an agreement before the bid process for the purpose of jointly bidding and then constructing the Jefferson Barracks Bridge substructure. Fru-Con was to be the sponsoring partner of this venture. Traditionally, the sponsoring partner is primarily responsible for the performance of the work.

Fru-Con's financial portion of this Joint Venture was to be sixty percent and Granite's the remaining forty percent.

In May of 1977, Fru-Con received a set of bid documents for review.[1] The contract documents given to the bidders included the proposed plans and drawings for the bridge itself, the *1976 Standard Specifications for Road and Bridge Construction,* and a document entitled *Notice to Bidders, Specifications, Proposal, Contract and Contract Bond.*[2] These documents, as one would expect, contain very specific information regarding the location of the

---

[1] This claim concerns one of seventeen competitively bid public construction contracts required for the complete construction of the Jefferson Barracks Bridge. The work done by the Joint Venture only deals with the substructure of the bridge. The substructure consists of piers upon which the superstructure will eventually rest.

[2] Within this document were the "Special Provisions" unique to the construction of this bridge. The Special Provisions supplement the standard specifications and if in conflict, take precedence over them.

structure, the soil involved, and the tendencies of the river, including river velocity and various river heights. According to those documents, the bids to be submitted by contractors were to be received by the Illinois Department of Transportation in Springfield by June 28, 1977. The work to be performed under this contract consisted of furnishing all materials, and the complete construction of the substructure for a three-lane bridge carrying the westbound traffic of Interstate 270 over the Mississippi River, and the full construction of piers 4 through 13 an partial construction of piers 5 and 6 for the three-lane eastbound bridge. The contractor, in its bid, was allowed to set aside monies for the construction of a means-of-access to the sites in the river where their work was to be performed. During the estimating period, Fru-Con considered several different options for such access, including a trestle, a dirt and bay causeway, and construction barges. The Joint Venture selected a temporary trestle as its means of access to the work in the river. The Joint Venture was responsible for the design of the trestle. It did not have to submit any design drawings or specifications relative to the trestle to the Illinois Department of Transportation for review or approval. The trestle was to be removed after the completion of the substructure.

In order to complete the task of constructing piers, the contractors awarded the job would have to install and then remove temporary structures in which the piers could be constructed. These temporary structures are called cofferdams. A cofferdam is a watertight enclosure from which water is pumped out to expose the bottom of the river and permit construction. With contract documents in hand, both Fru-Con and Granite independently prepared a bid estimate of the work, using the same format and costs for both labor and materials. Representatives of both companies visited the site during the preparation

process. However, no one from the Joint Venture viewed the site from the water. Before submitting the bid, the contractors were required to inspect the site and become familiar with the local conditions affecting the work. Also, since the Mississippi is a navigable river, the contractors were informed of the need to be familiar with the regulations and requirements of the U.S. Army Corps of Engineers and the U.S. Coast Guard. Shortly before the bid was due, representatives from both companies met in St. Louis and reviewed the work to be done and their respective estimates. These estimates were prepared independent of each other and then each company reviewed the other's estimate. The conflicts between the estimates were then ironed out by the members of the Joint Venture during meetings in St. Louis and it reached its proposed bid amount. Contractors who sought to bid the job had to first establish their experience and financial ability to perform the immense task of completing a structure of this nature. Both Fru-Con and Granite established that they were experienced in marine construction.

On June 28, 1977, the Joint Venture, along with two other bidders, submitted its bid to IDOT for the construction of the substructure. Their bid amount was Eighteen Million One Hundred Sixty Thousand ($18,160,000) Dollars. The Joint Venture was the successful low bidder over the other two contractors who bid $19,724,351 and $23,460,050 respectively. In July of 1977, IDOT awarded the contract to the Joint Venture. In August of 1977, the Joint Venture and IDOT signed a contract for the construction of the substructure at the bid price. The original contract completion date was to be October 1, 1979. The construction of this substructure began in the summer of 1977 and was eventually completed in December of 1981.

The piers to be constructed by the Joint Venture are numbered 1 through 14, pier number 14 being the westernmost pier located on the Missouri bank. Both the eastbound lanes and the westbound lanes had their own piers. The piers were each designated by number and the lower the number, the closer the pier was located to the Illinois side of the river. Piers 4 through 11 were commonly referred to as the approach piers. Piers 12 and 13 were the main span piers and, as such, were the largest. The bluffs on the Missouri side of the river are limestone and required a different type of construction for those piers than did the piers on the Illinois side of the river.

The design documents provided to the contractors made certain requirements upon the design of the cofferdams. Sheet pilings and bracing and accompanying struts were required to be made of steel. In addition, the drawing specified the width and thickness of the seal coats for the cofferdams and also the depth. The bottom of the seal coat was inferred by the contractor from the drawings which indicated the top elevation and also the thickness of that concrete block. Finally, the depth to which the sheet pilings could safely be driven could be calculated simply from the drawings because of the battering of some of the H-piles.[3] Battering is the placement of a pile at an angle to the river bed to widen the area of support and to increase its resistance to the horizontal forces directed against the pile from the direction the top end of the pile is pointing.

The contract which was signed by the Joint Venture required Claimant to begin work by August 21, 1977. At a meeting held on August 3, 1977, the Joint Venture indicated that it would be able to complete the project working a schedule of five days per week, eight hours per day.

---

[3] The term "H-pile" is synonymous with the term pile or piling; it is a long thin structural steel member which is driven on end into the ground or riverbed for the purpose of supporting the loads of the structure.

In addition, the Joint Venture was required to submit a construction schedule to the Department of Transportation. It did so on August 18, 1977.

After construction began, the Joint Venture encountered many difficulties, both anticipated and unanticipated. There are, however, two occurrences which form the basis of the substantial portion of the Joint Venture's claim. Sometime between 4:30 p.m. on Friday, March 24, 1978, and Monday, April 3, 1978, the partially constructed falsework at pier 12 was lost. It disappeared into the river. During that period, there were no employees on the job site to observe what exactly happened to the falsework. Falsework is a temporary structure erected to support permanent work in the process of construction.

Secondly, in the spring of 1979, the cofferdams for piers 9 and 10 and a trestle section connecting those piers collapsed during a high water period. This loss was actually observed by the personnel on the scene as it occurred, fortunately with no loss of life. These losses caused the Joint Venture to incur substantial sums to salvage and reconstruct the piers 9 and 10 westbound cofferdams and to recover the damaged work trestle section. The Joint Venture was forced to dredge the river for the trestle sections and cofferdams, to employ temporary measures allowing it to salvage on a more expeditious basis, to hire a diving firm which had not been anticipated, and to utilize equipment for which monies had not been budgeted. The Joint Venture had to literally begin again with regards to these cofferdams and the labor equipment and services necessary to do so caused the Joint Venture considerable increase in expense.

These losses were separate and independent of each other, but their combination effectively destroyed the timetable and budget of the Joint Venture.

## Categories of Claims

The Joint Venture makes claims in this cause for the following items:

A. The Joint Venture's pier 12 falsework loss, its salvage and the construction of a nose cell which was subsequently constructed to protect the new falsework;

B. The spring 1979 loss of piers 9 and 10 and the trestle sections between those piers allegedly due to scour;

C. Financial damages due to delay attributable to causes other than contract error. These include delay damages, which were directly connected to the pier 12 falsework loss, and the loss of the work trestle and piers 9 and 10;

D. An award for costs incurred as a result of the acceleration of work for IDOT's actions in denying or failing to grant in a timely fashion the Joint Venture's legitimate time extension requests;

E. Damages for the additional costs of performing extra grinding of the pier caps;

F. An award for the result of the stop work order on the pier 11 westbound foundation;

G. An amount of money for IDOT's refusal to pay for seal coat concrete which the contract required to be poured;

H. The unpaid contract balance of $681,819.86.

In the presentation of its claim, the Joint Venture has broken its losses down into two general areas: time related costs and non-time related costs. Non-time related costs are the direct costs of the items on which the work is done. An example would be the pier 12 nose cell which was a protective device installed after the loss of pier 12 falsework to protect the working structure from boats on the river. The second category of damages sought is the time related costs. When a construction contract is extended, the cost of that contract necessarily increases according to the length of the extension. Different kinds of time related costs presented in this claim include general administrative costs, labor escalation costs, and extended equipment costs, among others.

The total damages sought by the Joint Venture in this case are Sixteen Million One Hundred Seventy-Two

Thousand Sixty-Nine and 86/100 Dollars ($16,172,069.86) plus the costs of the money since the date of the completion of the contract.

## Cofferdams

In order to decide most of Claimant's claims, it is necessary to have an understanding of the process by which cofferdams are constructed and their purpose in the construction process.

Reduced to its simplest form, a cofferdam is a hole which is built into a body of water in order to create a dry and safe work environment. The service life of a cofferdam is much shorter than the service life of a bridge pier. Additionally, while it is in the river, the cofferdam provides a wider obstruction to the flow of water than do the finished piers. In this hole, work is carried out to construct a pier which forms the foundation for the bridge itself. Piers come in various sizes and shapes depending upon the width and depth of the river, the location of the pier itself, and whether or not it is a primary weight bearing pier in the bridge. The size of the pier affects the size of the cofferdam. Initially, with the aid of the drawings provided by the State, the contractors must determine the location of the pier and therefore the cofferdam in the river. When the location is determined, bearing piles are driven in a rectangular pattern and constitute the four corners of the cofferdam. Next a frame of structural steel, also known as a bracing frame, is constructed at a location near the river and floated out to the location of the pier. The bracing frame is slid down horizontally over the bearing piles so that it occupies a correct elevation in the river. Then individual sheet pilings are placed into the bracing frame and driven into the river bottom. These sheet piles are fitted together as closely as possible to simulate a watertight environment. When sheet piles are

completely fitted around the bracing frame, the contractor has now created what, from the air, looks like an open-ended box which has been thrust into the river. At this point, excavation within the four walls of the cofferdam is completed. This process involves removing mud from the riverbed through the water. Soundings are required to determine the depth of the river bottom as the mud is removed. Additional permanent piles are driven at the locations which are depicted on the plans through the riverbed down to the rock. These piles are driven from a large crane which contains a hammer and a "lead." The pile driving starts above the water, but once the pile is driven below the water, the driving must continue until the pile reaches the final condition in the rock beneath the riverbed. Some piles are driven straight up and down and others are driven at an angle. That angle provides additional stability for both the cofferdam and eventually the pier. The angle at which piles are driven controls the depth to which the original sheet pilings can be driven. All during this process, the water from the river is still in the cofferdam itself and surrounding the cofferdam. It is at this juncture that the construction process involves the placement of a "seal coat" or "tremie seal" at the bottom of the cofferdam. This concrete is poured to various depths depending on the river conditions and the size of the river involved.

A pipe capable of carrying concrete is placed in the water and pushed to the bottom of the cofferdam. Concrete is poured down the pipe until the entire bottom of the cofferdam has been filled. This concrete is called the tremie seal. During this phase, the pipe is moved around so that the concrete flows into all the areas of the riverbed within the confines of the cofferdam. The primary purpose of the tremie seal or seal coat is to form support for the cofferdam and to prevent the water forces of the river

from destroying the bottom of the excavation below the tips of the sheet pilings. The seal coat should counterbalance the upward forces created by the hydrostatic pressure preventing the cofferdam from floating. Additionally, any soil around the outside wall of the cofferdam helps to anchor it, but that soil cannot be relied upon to completely handle the pressure. After the tremie seal concrete has hardened, pumps are placed on top of the seal coat and the water is pumped out of the cofferdam to create the hole in the river. When the water is pumped out there is exposed the concrete surface of the tremie seal through which pilings are exposed. Steel reinforcement is then placed on the pilings to act as an anchor for the concrete which will be poured later. At this stage, only the tremie seal has been poured into the cofferdam and the majority of the concrete still remains to be placed above this level to form the pier. It should be noted that not all cofferdams require the placement of a tremie seal and the decision to eliminate that level of concrete is based on the depth of the water at that location and whether water is always at that location in the river. There are riverbeds, including this location on the Mississippi River, where the river sometimes dries up and the stability which is added by the tremie seal is not always required. There are additional levels of the concrete pier which must be poured on top of the tremie seal. They include the pedestal, the column, the web wall, and the pier cap.

The Court will first consider individually the claims for damages for the additional costs of performing extra grinding of the pier caps, the claim for an award for the result of the stop work order on the pier 11 westbound foundation, and the claim for an award of money for IDOT's refusal to pay for seal coat concrete which the contract required to be provided.

The Court will next consider the non-time related damages related to the pier 12 loss, the piers 9 and 10 and trestle loss, and lastly, the time-related losses.

### The Joint Venture's Claim for Costs Due to Extra Grinding of Pier Caps beyond the Scope of the Contract (Count 15)

Each pier to be constructed in the bridge had a flat area on its top referred to as the pier cap. A pier cap is the horizontal top portion of a bridge pier that receives loads from the horizontal bridge structure and distributes such loads down to the pier stem or column. The plans show that within each cap area there is designated a bearing surface for the structural beams that would lie horizontally across the piers and span those piers. During the course of the work, the Joint Venture and the Illinois Department of Transportation disagreed as to the interpretation of certain language in the Special Provisions concerning the grinding of the bridge seat bearing surfaces. The Special Provisions require that the bearing surfaces of each pier cap shall be ground to a proper elevation. The Joint Venture completed the grinding of the bearing surfaces of each bridge pier in compliance with the specified tolerances as shown on the plans. This grinding was completed prior to any directions by IDOT. However, a dispute then arose due to IDOT's position that the entire cap of each bridge pier must be ground, if necessary, within one-eighth inch of the elevation shown on the plans. IDOT expressed its position to the Joint Venture through correspondence in April of 1980. It is and was the Joint Venture's position that such work would constitute a change order and that the Joint Venture should be compensated for it. After April of 1980, IDOT revised its position by letter and demanded that less of the entire pier cap be grounded but nonetheless required grinding of

more than the bearing surface area. This revised area was still greater than what the Joint Venture believed it was required to grind. The Special Provisions provide in relevant part: "the tops of bridge seats and blocks for bearings shall be trowel finished to a true horizontal plane to the elevation shown on the plans within a tolerance of one-eighth inch. If the bearing surface is high, it shall be ground to the proper elevation." The Joint Venture interpreted the actual size of bearing surfaces to exceed the area of the anchor bolts depicted on the plan by only three or four inches; in other words, three or four inches outside the actual location where the plate would be laid. It was IDOT's position that the entire surface of the bridge pier should be ground to the specified height. Due to a threat by IDOT to withhold further payment and possible termination of the contract under the default provisions, the Joint Venture performed under protest the extra grinding work as demanded and now seeks an amount of Ninety-Four Thousand Nine Hundred Ninety-Eight Dollars ($94,998) to compensate the Joint Venture for work which was beyond the scope of the contract.

The Illinois Department of Transportation drafted the Special Provisions of the contract. It is axiomatic that where a contract is clear and unambiguous, the parties intent is to be drawn only from the words used. However, where there is any ambiguity in a contract it should be construed most strongly against the party who drafted the language. (*McDonnell Douglas Automation Co. v. State* (1983), 36 Ill. Ct. Cl. 46; *Turner Construction v. Midwest Curtain Walls* (1st Dist., 1989), 187 Ill. App. 3d 417, 135 Ill. Dec. 14, 543 N.E.2d 249.) The Court must determine if there is an ambiguity in the contract provisions. The Joint Venture's original bid reflects that it had planned to grind an area of the blocks for bearing much larger than that testified to by Claimant's witness, Mr. Bartholomew.

A review of the provision leads the Court to find that the language in the contract is ambiguous and therefore the dimensions of surface to be ground could have been reasonably interpreted by individuals to be different amounts. The Department of Transportation basically admitted in an internal meeting that the language of the Special Provisions was ambiguous as written. Further, Richard Hahn, IDOT's resident engineer, essentially agreed with the Joint Venture's interpretation of the term "bearing surface" as it related to the plans and sketches prepared. The actual size of each bearing surface exceeds the area of the anchor bolts depicted on that plan by only three or four inches. While IDOT may interpret this claim as being an attempt to make up for other losses the Joint Venture suffered, the Joint Venture did specifically request an explanation as to why the surface size had to be increased. The Department of Transportation could give the Joint Venture no legitimate answer but still demanded that the additional grinding be done. A memo dated July 28, 1984, prepared by the Illinois Department of Transportation, discusses the issue of the extra grinding of the pier cap. The contents of that memo are capable of different interpretations. The engineers from the Department felt comfortable with the language in the Special Provisions concerning the "bearing surface." However, the Court finds that the language of the Special Provisions which says, "if the bearing surface is high, it shall be ground to the proper elevation" is certainly capable of being interpreted in different fashions. Nowhere in the Special Provisions regarding the bearing plate is the word "complete" used to describe the surface to be ground. It is the Court's finding that this additional work did constitute a change order, that the Joint Venture promptly advised IDOT that the scope of the grinding work demanded was outside of the requirements of the contract, and that such work would

constitute a change order. Therefore, the Joint Venture preserved its right to recover additional monies pursuant to the contract. Based on the evidence adduced at trial as to damages, Claimant would be entitled to Ninety-Four Thousand Nine Hundred Ninety-Eight Dollars ($94,998) under count 15 for the extra grinding of pier caps.

### Stop Work Order–Pier 11 Westbound (Count 16)

In count 16 of the Joint Venture's complaint, Claimant seeks damages for the increased costs and damages after a stop work order was given by the Illinois Department of Transportation on pier 11 westbound.

Pier 11 westbound, as most of the Jefferson Barracks Bridge piers, was built on steel H-piles driven to bedrock. There is rock beneath the riverbed to which the H-piles are driven. After the pier 11 westbound cofferdam was dewatered, it was discovered that the tops of the steel H-piles protruding through the newly poured tremie seal were out of intended position and some were badly deformed. As a result, IDOT issued a stop work order to conduct an investigation. This stoppage of the work took place on June 19, 1980, and was documented in the resident engineer's memorandum some eleven days later.

In July, the Joint Venture notified IDOT that the stop work order was delaying the contract work at a crucial point and, therefore, the Joint Venture was entitled to both an adjustment in a contract sum and an extension of the time for completion of the contract work. On July 11, 1980, the Department demanded that the Joint Venture add four additional piles through the existing eleven feet of seal coat concrete which had previously been placed in the pier 11 westbound cofferdam. The Joint Venture did not understand how that order could be implemented and in a letter asked for an exact instruction from IDOT detailing

how that work was to be done. The letter stated that the Joint Venture could not be responsible for the integrity of the cofferdam in attempting to carry out this directive. In September of 1980, IDOT rescinded the stop work order but ordered the Joint Venture to raise the lower steel reinforcing mat of pier 11 westbound above the pile cutoff elevation and increase the thickness of the footing indicated in the plans by approximately two feet. The Joint Venture informed IDOT that this work was outside the scope of the contract and that any costs to perform this work and all costs caused by the delay were the responsibility of IDOT. Subsequently, the Joint Venture proceeded with and completed the work in accordance with the Department of Transportation directive. IDOT has refused to pay the Joint Venture for such costs. The delay accounted for 78 days. The issues in this court are whether the driving work was being improperly performed and whether the delay arising from the stop order and the resulting costs and damages suffered by the Joint Venture were caused by IDOT.

The Illinois Department of Transportation had an inspector present during the pile driving operation on pier 11 westbound. That inspector checked the layout and location of the H-pile template and the leads prior to driving and also checked the batter or plumbness of each H-pile prior to driving. The plans provided that the contractor would furnish and install 70 steel H-piles as part of the foundation. The plans also specified the location and orientation of each of the H-piles. Unlike the H-piles driven to that point, this pile driving equipment was located on a barge in the river and the State contends that the movement of the barge led to the misplacement of the piles. During the course of the delay, it was determined that 59 of the 70 piles were out of position to the point where they were in violation of the contract. The Department of Transportation concluded that the piles at pier 11 westbound

were not actually overdriven. Eventually IDOT determined that a limited number of corrective actions should be taken and the work would be accepted at pier 11 westbound, although defective in the eyes of the Department.

The Joint Venture maintains that it was not responsible for the damage to the top of the piles or to the misalignment of the piles claiming that the Department of Transportation in reality controlled those items. The Illinois Department of Transportation engineers set and define the point of refusal on rock for inspection as five to ten blows of the pile driving hammer with no movement. At that point, the pile would be driven no further. The type of hammer utilized at all piers was approved by IDOT. During the course of the work on pier 11 westbound, the Joint Venture personnel indicated to IDOT that the piles were being overdriven. However, the pile driving problems that were discovered at pier 11 westbound did not appear at any other pier and the IDOT inspector responsible for pier 11 westbound was also the primary inspector for pile driving on the entire project.

Of the 70 piles required by the plans, 59 of the piles were further out of position than the tolerances and the contract allowed. While it is the Joint Venture's position that this misalignment was caused by the overdriving, many of the piles had no damage to the top and were simply out of alignment. The force utilized was not sufficient to damage those particular piles. While this may be explained on the basis of individual strength characteristics or each H-pile, the number of piles out of alignment is a significant factor in this claim. The Department of Transportation maintains that the placement of the pile driving hammer on a barge affected the Joint Venture's ability to drive the piles correctly. The Department maintains that the movement of the barge resulted in the

movement of pile driving equipment as it pivoted around the template the Joint Venture used to position its piles.

Section 108.08 of the Standard Specifications for Road & Bridge Construction, a part of the contract documents, provides that the resident engineer has certain authority to suspend work wholly or in part as he may deem necessary as a result of conditions which warrant such action. There is no disagreement that at this point, after the cofferdam was dewatered, it was necessary for all parties to take a step back and evaluate the situation. The Joint Venture went as far as hiring an outside expert to investigate this problem and to reach conclusions regarding the cause and effect of the findings.

To prevail, the Joint Venture must prove that the Department of Transportation was the cause of the delay and that no concurrent cause would have equally delayed the contract regardless of the Department's actions or inaction. The Joint Venture must show a delay of an unreasonable length of time, that the delay was proximately caused by the Department's actions, that the delay resulted in some injury to the contractor, and that the government was the sole proximate cause of the delay. (*Avadon Corporation v. United States* (1988), 15 U.S. Ct. Cl. 648; *Illinois Construction Corp. v. State* (1993), 45 Ill. Ct. Cl. 124; *Walsh v. State* (1969), 24 Ill. Ct. Cl. 441.) The Joint Venture has failed to prove that this delay was unreasonable and solely caused by the government. The structural integrity of the pier was in question at the time the cofferdam was dewatered. Not to stop at that stage would have been foolhardy. There were two reasons for the stop work order, namely the misalignment of H-piles and the damage to the H-piles. While the damage to the H-piles may be explained by overdriving, the misalignment of so many H-piles was not likely caused by the overdriving.

Whether it was, in fact, caused by the placement of the driving equipment on a barge is not completely clear. However, what is clear is that the Claimant has failed to prove that the directions of the resident engineer caused the misalignment of the piles. In and of itself, the misalignment of the piles would have caused significant delay and it is not possible to separate that delay from that delay attributable to the damaged piles. For this reason, the suspension of work cannot be attributed to be solely caused by overdriving. Therefore, it is not necessary to consider whether the directions of the resident engineer caused the damage to the H-piles because that could not be the sole proximate cause of the delay. Therefore, we find that Claimant has failed to meet its burden of proof as to this claim and Claimant's claim for damages due to the stop work order—pier 11 westbound should be denied.

## Seal Coat Concrete (Count 17)

The Joint Venture's complaint seeks damages for the State's failure to pay for certain amounts of concrete used in the seal coat. During the construction of the piers, the soil inside the cofferdam was excavated down to the approximate bottom of seal coat as depicted in the plans. Since the seal coat must go to a certain depth, the excavation for that seal coat must go marginally below the elevation shown on the plans to assure that the bottom of the seal will, in fact, be at or just below the elevation. It is essential that the seal coat be properly constructed in order to prevent the cofferdam sheets from pulling out of the river bottom due to hydrostatic uplift forces thereby destroying the cofferdam. The plans depict the vertical dimension of each seal coat and the concrete quantities of each seal coat. The language on page 12 of the Special Provisions provides the standard for the measurement of the concrete in the seal coat: "Concrete in the seal coats

will be measured for payment in accordance with Article 503.17 of the Standard Specifications." Article 503.17 of the Special Provisions provides, "The vertical dimensions used in computing the volume (of the concrete) shall be the average thickness of the bottom of the excavation and the top of the seal." The engineer for IDOT measured those two items. The Joint Venture claims that the purpose of the preceding article is to pay the contractor for the seal coat concrete actually placed within the cofferdam minus any unsound concrete on the top. The State takes the position that the contract does not give the contractor the right to payment determined by the actual dimensions of concrete placed because that would allow the contractor to set his own compensation. The State believes that the acceptance of the Joint Venture's position would in effect allow a contractor to convert its overexcavation within the cofferdam to additional work for which it will be paid. The Respondent maintains that the additional concrete which was poured was not required by the contract and therefore compensation should not be paid. In evaluating this issue, the Illinois Department of Transportation resident engineer prepared sketches of each pier seal coat with mathematical computations for concrete quantities using three methods for computing the seal coats. The first used the dimensions actually shown on the plans. The second method used the actual top, minus unsound concrete, and the bottom elevation shown on the plans, and the third method used the actual top and actual bottom of the piers themselves. The IDOT position is the second of the three alternative methods and the Joint Venture position is the third method. Because the Special Provisions use the word "average," it is clear that the contract is not using the theoretical quantity as depicted in the plans. The rationale behind Article 503.17 of the Special Provisions is that the contractor should only be paid for concrete which is required to be poured

and not that which the contractor actually pours. The Special Provisions provide notice to the contractor that overexcavation, while not harmful, will create a need for additional concrete for which the contractor will not be compensated. Section 503.17 further states that "in computing the yardage of concrete for payment, dimensions used will be those shown on the plans or ordered in writing by the engineer." These provisions and those cited earlier in the standard specifications are not complicated nor are they given to numerous interpretations. This language places the burden on the contractor not to over-excavate cofferdam locations. It is not the responsibility of the State under the contract to pay the Joint Venture from the actual bottom to the actual top of the seal. By over-excavating and creating a void to be filled with concrete, the Joint Venture could have poured substantially more concrete than is called for in the plans to the detriment of the State. For these reasons, the Claimant's claim for an amount of money for IDOT's refusal to pay for seal coat concrete is denied.

Pier 12 Loss—Non-Time Related Damages
(Counts 6-9)

In counts VI through IX of the Joint Venture's complaint, Claimant alleges alternative theories of liability for the non-time related damages as a result of the loss of the pier 12 falsework. Sometime between March 24 and April 3, 1978, the steel structure which constitutes the falsework disappeared into the river with no witnesses as to what caused the disappearance. The Joint Venture claims that it should be compensated for pier 12 losses for one or more of the following reasons: the contract documents were defective because they failed to disclose an auxiliary channel in the river where pier 12 was to be built; the Illinois Department of Transportation failed to reveal vital knowledge concerning that channel to the Joint Venture during the

bid process; IDOT misrepresented the existence of only one navigational channel in the river even though it knew of an auxiliary channel through the area of the pier 12 cofferdam; and the actual river traffic in the area of pier 12 was materially different than depicted in the contract documents, and therefore constituted a changed condition under Article 104.04 of the Standard Specifications. The Joint Venture maintains that a boat or barge in the auxiliary channel struck the falsework and destroyed it.

In April of 1977, when the Department of Transportation issued the service bulletin notifying contractors that it would take bids in June for the construction of the substructure of the Jefferson Barracks bridge, the plans and proposal forms were made available to the contractor upon request. All bidders were to carefully examine the proposal forms, plans, specifications, Special Provisions and the form of the contract utilized. In addition, the contractors were to inspect the site of the proposed work and familiarize themselves with all the local conditions affecting the contract and the detailed requirements of construction. The contractor, if it received the bid, would be responsible for all errors in its proposal resulting from any failure to comply with these instructions. At the time of its site inspections, the Joint Venture's employees observed river conditions in both low and high water conditions. As shown in the plans, piers 4 through 11 of the bridge were considered approach piers and piers 12 and 13 were the main span piers. The plans provided to the contractors show an 850-foot navigational clearance between the new main piers 12 and 13 and also a 645-foot navigational clearance between piers 5 and 6 of the existing Jefferson Barracks Bridge. Marked navigational channels assure operators of boats, barges and tugs that the river is sufficiently deep in that location for safe passage. Before and

during the bid conference in which the Joint Venture prepared its bid, members of the Joint Venture reviewed, discussed and interpreted the contract documents and came to the conclusion that the contract documents excluded a contractor's risk of loss from a collision from passing river traffic at pier 12. The Joint Venture's pre-bid examination of those plans and specifications and the project site of the work led the Joint Venture to the conclusion that any passing river traffic would be confined to the 645-foot wide corridor of the river designated on plan sheet 17 as the navigational clearance. For this reason, the Joint Venture included no money in its bid to provide protection to pier 12 of the new bridge against the risk of collision from passing river traffic. It did interpret the Special Provisions to require protection against other risks during the construction process. These included an adequate means of protection against damage by scour, high water, the accidental collision of floating equipment, and also protection against wave action from passing river traffic in the construction process. The Joint Venture interpreted the "floating equipment" provision as meaning the contractor's equipment being used at the project site to perform the work.

In early 1978, the Joint Venture began the construction of the falsework for the pier 12 cofferdam. By early March of 1978, the Joint Venture had driven spud piles into the river bottom and installed part of the upper two cofferdam bracing frames to be used as templates against which the sheet pilings would be supported. Additionally, the Joint Venture had placed navigational lighting on top of a single sheet pile on the west side of the falsework in accordance with instructions given to it by the coast guard. That light was located higher than the eventual flood water which would occur in March and April of 1978. The pier 12 cofferdam construction was behind the schedule presented by Claimant, through no fault of Respondent. By

March 24, 1978, the elevation of the Mississippi River had dramatically risen to the top of the pier 12 cofferdam work. The Joint Venture maintains, however, that the water did not go over the top of the one temporary sheet pile which contained the navigational light on the west side of the falsework. Sometime between 4:30 p.m. on March 24, 1978, and 8:00 a.m. on April 3, 1978, the pier 12 falsework disappeared into the river. There were no witnesses to what caused it to disappear. The Joint Venture maintains that pier 12 falsework was destroyed by a runaway tow or barge, in other words, passing river traffic. To justify this claim, the Joint Venture essentially points to two facts as proof of the means by which the pier 12 falsework was destroyed. First, when the 1978 flood waters receded, there was a chip in the concrete at the then existing pier 6 of the old bridge, located adjacent to the location of the pier 12 falsework. The Joint Venture believes that this chip is evidence of a collision with old pier 6 and the new pier 12 falsework adjacent to it. Additionally, salvage operations were performed immediately following the loss and the falsework structural steel and sheet pilings were recovered, including the extended sheet pile from the west side of the falsework. The Joint Venture maintains that the manner in which the sheet pile was bent and twisted towards the Missouri side of the river indicates damage from passing river traffic. Further, the vertical steel members were bent at the mud line which effectively ruled out the possibility of scour failure. Subsequent to the salvage of the falsework, the Joint Venture installed a protective nose cell slightly upstream from the location of pier 12 so that additional work would not be jeopardized. Eventually that structure was removed when work was completed.

Both Claimant and Respondent are now in agreement that pier 12 was to be constructed in a location which

had been considered an auxiliary channel for river traffic. During the pre-bid inspection time, there existed navigation lights on both the upstream and downstream sides of the existing bridge which could be observed during the inspection process. Those lights existed in mid-span between the old bridge piers 6 and 7 and identified the auxiliary navigational channel. While there is some question whether the Joint Venture inspection team observed those navigational lights, witnesses for the Joint Venture acknowledged that those markings existed prior to the time the Joint Venture submitted its bid. No one from the Joint Venture viewed the location from the water.

As depicted in plan sheet 17, pier 12 was to be located approximately 200 feet east of the navigational clearance, such clearance being shown on the plans. In pre-bid meetings, the Joint Venture's project engineer included monies in his estimate for a protective device referred to as a "dolphin." That protective device would have served just north of the pier 12 construction. After a review of all of the contract documents, these monies were deleted when the Joint Venture, through the person of Stuart Bartholomew, concluded that the contract did not require the Joint Venture to assume the risk of damage by passing river traffic. Therefore, the Joint Venture included no money in its bid to provide protection at pier 12 against the risk of collision from such traffic. The alternative theories of liability submitted by the Joint Venture all rely upon one fact: had the Joint Venture known prior to the bidding process of the existence of the auxiliary navigational channel with the accompanying risk of collision from such traffic, the Joint Venture would have provided an adequate means of protection against damages to the pier 12 work from accidental collision from river traffic.

In failing to provide information regarding the auxiliary channel, the State, according to the Joint Venture, breached the warranty that its contracts, plans and specifications were accurate and could be relied upon. Because that warranty was breached, the Joint Venture maintains that its detrimental reliance of acting upon that warranty caused the pier 12 loss and the State should be liable therefor. The law, according to the Joint Venture, places an affirmative duty on parties such as the State to disclose vital information to the performance of the contract and the failure to disclose that information should result in the government being responsible for whatever damage occurs. It was contended that plan sheet 17 was incomplete in that it failed to disclose the presence of the auxiliary channel. Whether such a representation is intentional or simply an omission, the Joint Venture maintains the State's plan sheet represented the existence of only one navigational channel in the river and that the Joint Venture reasonably relied upon that representation to its detriment. Additionally, the Joint Venture maintains, even if the contract documents are not defective or the State is not guilty of misrepresentation, the existence of the channel was a physical condition differing materially from that which was indicated in the contract plans and, therefore, falls within the meaning of the changed conditions provision.[4]

---

[4] Article 104.04 of the Standard Specifications for Road and Bridge Construction provides in relevant portion, "Should the contractor encounter or the department discover during the progress of the work *subsurface* or *latent* physical conditions at the site differing materially from those indicated in this contract, or unknown physical conditions at the site of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the contract, the engineers shall be promptly notified in writing of such conditions before they are disturbed. The engineer will thereupon promptly investigate the conditions and if he finds they do so materially differ and cause an increase or decrease in the cost of, or the time required for performance of the contract, an equitable adjustment will be made and the contract modified in writing accordingly.

Any adjustment in compensation ° ° ° will be made in accordance with the provisions of Article 109.03."

The Claimant maintains that the existence of river traffic was materially different than the conditions depicted in the contract documents and that the additional work, including the salvage and reconstruction of the work destroyed and the construction and eventual removal of a protective nose cell, constituted a substantial modification of the work to come within the changed conditions provision. The Joint Venture site investigation disclosed no evidence of this changed condition, or that the plan sheet was incomplete. Claimant's site investigation revealed no river traffic in the area where pier 12 was to be constructed.

The actual existence of the auxiliary navigational channel is not in issue. In issue, however, is the question as to when the Joint Venture first became aware of the existence of such a clearance. In 1972, there were plans and specifications developed for a two-lane bridge to run adjacent to the 1941 structure. While those plans were eventually shelved, plan sheet 3 from those plans showed both the main navigational channel and an auxiliary channel. The Joint Venture maintains that it was only after seeing this plan sheet, long after the loss of pier 12, that it became aware of the auxiliary channel.

The State maintains that the Joint Venture failed to establish that the falsework loss was caused by the collision with river traffic, but even if it had, the Joint Venture failed to establish its right to recover under any of its theories.

The Jefferson Barracks Bridge spans the Mississippi River at a location where the river is approximately 3,600 feet wide from shore to shore. The navigational clearance is established in the plans as 645 feet wide. However, the navigational clearance is a warning to mariners that this portion of the river will grant safe passage for traffic because of its depth for virtually the whole year. The Joint

Venture's conscious decision to not include a protective cell, deflector, or other protective device was to assume that no circumstances would exist where a runaway barge would leave the navigational channel or an inexperienced operator of a water craft might make a mistake about the location of safe waters. The contract documents only warranted that the navigational clearance existed at the location depicted on the plans. It did not warrant nor could it warrant that river traffic would not pass at or near pier 12 during the construction process or even further east of pier 12. The State was never in a position to completely confine river traffic to the navigational clearance, nor did it promise that it would do so in the contract documents. Therefore, the conclusion that the river traffic would necessarily be confined to the 645-foot corridor was not justified. Depending upon the season of the year, the river waters rise and fall. The spring, because it brings rains, also brings a higher river. When the river elevation increases, passage outside of the navigational clearance becomes more likely. The Joint Venture placed a light on top of its pier 12 falsework for the very reason that river traffic might creep into this area.

Additionally, the State presented evidence that the Joint Venture was caught with an unstable structure in the water during the flooding period and that the strong flow forces of the river caused the collapse of the pier 12 falsework. The Claimant contrasts that evidence with the two facts which the Joint Venture maintains are proof that a passing vessel destroyed the falsework, namely, the chip at old pier 6 in the concrete pier, and the damage done to the falsework. As there were no eyewitnesses and with the evidence conflicting, it is difficult to reach a conclusion by a preponderance of the evidence as to which cause is most likely. However, it is simply not necessary to reach that decision because the law does not justify compensating the

Joint Venture even if passing river traffic destroyed the pier 12 falsework. The plans provided to the Joint Venture do not make any representation that the navigational clearance is the only place where river traffic will travel. While it is reasonable to assume that most of the larger vessels will attempt to pass this location in the navigational clearance, it is unreasonable to assume that all river traffic will be confined to that clearance. Pier 12 is and was one of the main river piers. As such, it constituted a major investment for the Joint Venture because of its size. Whether there existed an auxiliary clearance or channel, the fact remains that there is no direct evidence as to how the falsework was lost. Even if a boat, barge or tow destroyed the pier 12 falsework, there is no evidence that the operator of that craft was in the vicinity simply because he or she knew of the existence of the auxiliary channel. A runaway barge or floating craft would not necessarily have occupied that position because of the channel. It is more likely that such a vessel, because of its lack of control, would stray from the main navigational channel regardless of how the rest of the river is characterized. This is especially true in a period of high water. While it is true that a contractor will not be responsible for the consequences of defects in the plans and specifications and that the responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, check the plans, and inform themselves of the requirements of the work, the State in this case made no representation that all river traffic would be confined to the navigational clearance. In that respect, this case differs from the cases cited by the Claimant. In *United States v. Spearin* (1913), 248 U.S. 132, 39 S. Ct. 59, a contractor brought suit for work done under a contract to construct a dry dock. The contractor had entered into an agreement to build a dry dock at a naval yard. The plans and specifications which

had been prepared by the government revealed that the site was intersected by a six-foot brick sewer and it was necessary to divert and relocate a section thereof before the work of constructing the dry dock could begin. The plans and specifications provided that the contractor should do the work and provide the dimensions, materials and location of the section to be substituted. However, approximately a year after the relocation of the six-foot sewer, there occurred a sudden downpour of rain coincidental with a high tide. The increase in pressure broke the six-foot sewer as it had been relocated and the excavation of the dry dock was flooded. Upon investigation, the contractor discovered that there was a dam approximately five feet high in a seven-foot sewer causing an accumulation of water and the eventual destruction of the sewer. Although the sewer was part of the city sewage system, the dam was not shown on either the city's plans or on the government's plans or blueprints, the only documents which were received by the contractor. It was revealed that the site selected for the dry dock was low ground and the sewers had, from time to time, overflowed to the knowledge of the government officials and others because of this dam. These facts had not been communicated to the contractor. In order to complete the project, other contractors had to discontinue the use of this intersecting sewer and then reconstruct it with a different size, shape and material so as to remove the internal pressure and, therefore, the flooding. The Court found that the sewer, as well as other structures, were to be built in accordance with the plans and specifications furnished by the government. The construction of the sewer constituted as much an integral part of the contract as did the construction of the dry dock itself. The Court further found that the risk of the existing system proving adequate might have rested upon the contractor if the contract for the dry dock had not contained

the provision for relocation of the sewer. With the insertion of the articles prescribing the character, dimensions and location of the sewer, the contract warranted that if the specifications were complied with, then the sewer would be adequate. The Court affirmed the judgment of the Court of Claims in favor of the contractor.

The case at hand is distinguishable from *Spearin*, *supra*, for the obvious reason that the State did not and could not warrant that no river traffic would pass outside the navigational clearance at any time during the construction process. At the time of the inspection process in the instant case, there were navigational lights over the pier 12 area on the old Jefferson Barracks Bridge. Unfortunately for the Claimant, the Joint Venture did not observe them during the course of their inspection. Further, the passing river traffic does not fall into the category of subsurface or latent physical conditions as used in the Special Provisions of the contract. Passing river traffic is neither hidden from view nor in the water or soil. Therefore, the changed condition provision of the contract does not apply in this instance. For these reasons, the Claimant's claim for the pier 12 falsework damage is denied.

### Piers 9 and 10, Scour Losses (Counts 10-13)

In counts 10 through 13, the Joint Venture seeks recovery for the costs of salvage and reconstruction of its piers 9 and 10 cofferdams and the section of the connecting work trestle, all of which collapsed in March of 1979 allegedly due to the scour[5] which occurred in the riverbed. Scour is the removal of riverbed material from the bottom or banks of a river by the erosive action of flowing water.

---

[5] By agreement of the parties, the following definitions have been placed in the record. (A) local scour–the erosion of river bed material resulting from the local increases in flow velocity and turbulence around a structure (In this case, the cofferdams placed in the river), (B) general bed scour–the erosion of river bed material caused by an increase in water velocity and other factors, other than local scour around a structure.

In these counts, the Joint Venture alleges alternative theories of liability against the State. Claimant's theories of liability are based on the following matters:

(a) the susceptibility of the riverbed to develop severe scour in the location of piers 9 and 10 was a physical condition differing materially from that indicated in the contract and within the meaning of the contract's changed conditions provision;

(b) the Illinois Department of Transportation breached the implied warranty that its plans and specifications were adequate, accurate, not defective and could be relied upon regarding the susceptibility of the riverbed to develop severe scour in the locations of piers 9 and 10;

(c) the Illinois Department of Transportation's failure to disclose its superior knowledge of the susceptibility of the riverbed to develop severe scour in the locations of piers 9 and 10 constituted a breach of contract;

(d) the Illinois Department of Transportation is liable to the Joint Venture for breach of contract based on the Department's misrepresentation concerning the susceptibility of the riverbed to develop severe scour in the locations of piers 9 and 10.

The Joint Venture claims that it was unaware of the risk of scour at these locations and that, if properly informed, it would have afforded scour protection for the piers 9 and 10 cofferdams.

The Department of Transportation contends that the Joint Venture was aware of the risk of scour and planned to monitor and protect its work against the risk of scour during the construction process. Therefore, since the premise upon which all of the Joint Venture's scour loss is built is false, the Joint Venture is not entitled to any recovery for piers 9 and 10 and the relevant section of the work trestle. Additionally, it is the contention of the State that the scour which contributed to the loss of the Joint Venture's cofferdams and trestle was caused by the accumulation of a field of debris against the trestle.

As indicated earlier in this opinion, the trestle was chosen as a means of access to the work site by the Joint Venture during the pre-bid process. The trestle was designed and built by the Joint Venture. The design of the

trestle was not viewed or approved by the State and it was built on pipe pilings spaced 30 feet apart with the trestle deck placed at an elevation of 400 feet. The bottom of the trestle deck was at an elevation of 396.5 feet. During periods of high water, a river such as the Mississippi carries large amounts of debris. Such debris includes trees and logs washed away from the shore during the spring rains. These materials tend to accumulate against structures in the water, including a structure such as a temporary trestle. The plans indicated that the ordinary high water for the Mississippi River was at an elevation of 405.9 feet, five feet higher than the trestle deck. The State contends that the Joint Venture should have placed the trestle deck at an elevation of at least 410 feet, thereby reducing the risk of debris accumulation. The State offered evidence that the debris placed a tremendous lateral load on the trestle and eventually, on March 21, 1979, it collapsed as a result of that load and scour. Whether it collapsed due to scouring and that load or simply the scour is a question of much debate between the parties. However, it is evident that the scour played a significant role in the collapse. The scouring process which takes place in a riverbed is caused by the narrowing or removal of a channel through which the water may flow. The narrowing causes the velocity of the flow to increase in other locations. The increase in velocity increases the stress on the riverbed thus causing it to move. The larger the blockage, the greater the increase in stress and therefore the more likely that scour will take place. The largest amount of scour occurred with the debris field present around piers 9 and 10.

At trial, numerous witnesses testified to the issue of scour and its effect on this project. The hundreds of exhibits included each side's moving model with water, riverbed material and obstructions. Three facts emerged

which are much clearer than the waters of the Mississippi. The first is that the accumulation of debris around piers 9 and 10 was a factor which contributed to the amount of scour which occurred. Secondly, scour was a significant problem in the Mississippi River prior to the construction of the Jefferson Barracks Bridge. Finally, the State had some knowledge of the scour problem but the contract documents alluded to scour only as a problem near the main navigational clearance and not near piers 9 and 10.

The Claimant maintains that there existed certain contract indications that scour would not be a problem at or near piers 9 and 10. The Special Provisions of the contract referenced the work to be done on the pier 12 cofferdam for both east and westbound bridges. The Special Provisions read as follows:

"The work under this item includes the furnishing, driving, installing and later removal of all temporary steel sheet piling and bracing required for construction of the temporary cofferdam at pier 12 for the eastbound and westbound roadways and the furnishing, installing, maintaining and later removal of an adequate means of protection during the construction period against damage by scour, high water, ice or accidental collision of floating equipment."

Similar language is utilized with regards to scour in the Special Provisions regarding the cofferdam at pier 13. The contractors were specifically told that it was their responsibility to provide an adequate means of protection against scour during the construction period for these two piers. The Special Provisions make no such statement regarding piers 4 through 11 and the accompanying cofferdams. Further, at pier 12 which was a larger pier, 384 H-piles are called for in the drawings. At piers 9 and 10 westbound, the drawings called for only 50 H-piles. Importantly, none of the piers 9 and 10 westbound H-piles were to be battered in an upstream/downstream direction. In addition, in the original drawings, the orientation o the H-piles was in a cross-river fashion. Subsequent to the scour losses, the orientation of the H-piles was changed so that its

strong direction of bending resistance was in an upstream/downstream direction. Also, after the scour losses, piers 9 and 10 were rebuilt with 20 battered piles at each pier.

The Joint Venture did protect the pier 12 cofferdam pursuant to the language in the Special Provisions. Although such protection can take different forms, the Joint Venture chose a rip rap blanket which is a blanket of large stones or broken rock placed around the cofferdam in the water as protection against erosion from the flow. No rip rap blanket or other means to prevent or protect against the development of scour was employed at the piers 9 and 10 westbound cofferdams. No money was placed in the bid by the Joint Venture for such protection. During the pre-bid stage, representatives of the Joint Venture determined that the pier 11 cofferdams were close enough to the main channel that scour was possible at that locale and, therefore, the Joint Venture elected to include some monies in its pier 11 estimate for rip rap in case scour should develop. The facts that piers 9 and 10 were further east of the main channel led the Joint Venture to take no steps with regards to scour protection. As a result of the 1979 scour losses, the Joint Venture did install a rip rap blanket as scour protection for the pier 10 westbound replacement cofferdam. Also in reconstructing the trestle sections after the scour loss, the legs of the trestle were battered in the downstream direction, thus providing more strength to the base. Additionally, the Claimant used a bolted-type trestle in reconstruction.

The State argues that the custom and practice in the construction industry entitled the Joint Venture to take certain risks regarding the means and methods of performing the work in the contract. Which risks the Joint Venture was willing to assume affected the bid it submitted. The State contends that if the risks that the contractor took did

not work to the benefit of the contractor, the State should not be liable for those failures. The State believes it was the risk of the contractor to protect or not protect piers 9 and 10 from scour. While that is clearly true, the contractor must be able to rely upon the contract documents, including the specifications and Special Provisions, in preparation of its bid and the execution of the contract. The construction bidders are to compute their bids not upon the basis of their own investigation of the scene, but upon the basis of what is indicated in the specifications and in the drawings. It also is unclear how an examination of the scene, essentially a tour of the river, would reveal the amount of scour which takes place in the Mississippi River. Additionally, it might be added that while it is true the contractor takes certain risks in its bid process, the State also takes certain risk when it fails to disclose information which affects the execution of the contract, whether that disclosure is intentional or not.

The standard specifications contained articles which are commonly referred to as changed conditions provisions. Article 104.04 recognizes two classes of changed conditions. The first type of changed condition is a subsurface or latent physical condition which differs materially from that which is indicated by the contract documents. The second type of changed condition occurs where the contractor encounters a subsurface or latent physical condition which differs materially from that which is ordinarily encountered and generally recognized as inherent in the work of the character provided for in the contract documents. The threshold question under the changed conditions provision has to be whether scour at the location of the Jefferson Barracks Bridge is to be considered a subsurface or latent physical condition. If scour is a subsurface or latent condition then the trier of fact must address the issue of whether or not the scour encountered meets

either of the tests under Article 104.04 of the Special Provisions. An indication may be proven by inferences and implications which need not meet the test for misrepresentation. It is not necessary that a contractor be actively misled or that the State has withheld or concealed information in order to prove a changed condition. (*Foster Construction & William Bros. Co. v. United States* (1970), 435 F.2d 873.) Based on all the evidence, we find that the scour encountered by the Joint Venture during the construction process and which caused piers 9 and 10 to collapse was, in fact, a Type 1 changed condition under Article 104.04.

The American Association of State Highway & Transportation Officials, otherwise known as AASHTO, published standards for designers of roads and bridges. In so doing, the AASHTO specifications do not identify how a designer should go about identifying or quantifying a scour risk to a contractor. The designer is also not told how to protect against the scour. In spite of those standards, the Illinois Department of Transportation and its design firm, the Benesch Company, provided certain information in the plans and specifications which can be considered indications on the issue of scour or the absence of scour.

The Special Provisions contained a notation that one or more of the Illinois approach piers, specifically piers 4 through 11, could have its cofferdam deleted by the State engineer on the job. The seal coat forms part of the cofferdam and a failure to place the cofferdam or to utilize the cofferdam at any of those locations would also mean a footing without the use of the seal coat. One of the purposes of the seal coat is to protect against scour. Secondly, the Special Provisions specifically provided that the contractor was to protect the piers 12 and 13 cofferdams from scour. Piers 12 and 13 are the main support piers for the bridge and are much larger. The bid drawings for piers 9 and 10 called

for the use of 50 H-piles while the bid drawings for pier 12 required the placement of 384 H-piles. These numbers are more disproportionate than the size of those piers.

The plans and specifications provided by the State established some of the criteria and dimensions of the cofferdam designs. IDOT effectively controlled the types of materials to be used, the elevations of the top and bottom of the cofferdam, the dimensions and elevations of the seal coats, and the width of the cofferdam. Additionally, because of the requirement that certain H-piles be placed in a battered position, the sheet pilings can only be driven to a certain depth. The effect of this control exercised by the State left the Claimant with little input as to the cofferdam design. Further, in dealing with scour, the cofferdam design may not be as essential as the manner in which a contractor chooses to protect the cofferdam against that scour. There are various methods to use to protect against scour. Most of them deal with the placement of materials or items around the cofferdam itself or upstream of the cofferdam.

The depth of the bottom of the tremie seals at piers 9 and 10 was relatively shallow compared to the tremie seal depth at pier 12. Also, the size of the pier footings at piers 9 and 10 was significantly smaller than the substantially larger pier 12 footing. Finally, according to the drawings provided to the Joint Venture no H-piles utilized in piers 9 and 10 were to be battered in an upstream/downstream direction. Battering is a common means to provide resistance to the lateral forces resulting from scour.

Most significant of these factors is the State's willingness to indicate to the contractor that scour should be protected against at piers 12 and 13, yet failing to mention the possibility of scour at piers 9 and 10. That omission would certainly lead a reasonable contractor to conclude that money should be provided in the bid for scour protection

only at the piers mentioned. It is important to note that the period from the preliminary study of the construction of this bridge to the issuance of the as-bid drawings in 1977 spanned a period of ten years. The State, its agents, and its bridge designers had that period of time to compile the relevant data regarding the Mississippi River before the service bulletin was issued in this matter. That time period must be compared with the two months between April 26, 1977, and June 28, 1977, the time frame provided to the potential bidders to receive the plans and proposal forms and to submit a bid after evaluating all the available data provided by the State. Evidence was presented which revealed that during the ten-year period, IDOT through its agents had knowledge of a continuing scour problem at various locations. From that knowledge an inference could be drawn that scour could become a significant problem on the eastern portion of the river at Jefferson Barracks.

Under a Type I differing site condition claim, a contractor is entitled to additional expenses and damages resulting from a differing site condition which has been exacerbated by an event neither party is responsible for. (*Glagola Construction Co.*, ASBCA #45579, 93-3BCA26179; also, *D.H. Dave & Gerben Contracting Co.*, ASBCA #6257, 62BCA3492.) This concept becomes relevant when the trier of fact is confronted with the State's contention that while the scour played a role in the destruction of piers 9 and 10, the accumulation of the debris field was, in fact, the primary cause of those losses. The State blames the accumulation of the debris on the height of the trestle which was placed in the river. However, subsequent to the loss, the district engineers recommended and IDOT granted the Joint Venture a time extension for the loss, salvage, and rebuilding of the lost cofferdams and work

trestle.[6] Clearly, subsequent to the piers 9 and 10 losses, the Department identified the accumulation of the debris field as a culprit in this disaster. Further, virtually all of the experts, engineers and people that had hands-on experience in this type of construction, indicated that the size of the debris accumulation and the speed with which it occurred were unforeseeable and unexpected. While a certain amount of debris could always be expected in the Mississippi, the massive volume of debris which formed had not been anticipated by any of the people involved in the preparation of the design or in the construction of the bridge itself. Additionally, the Court takes note that Pier 11 also experienced problems and was almost lost yet had no substantial debris field.

In order for a plaintiff to prevail on a Type I changed condition theory, it must establish the following: (a) the contract documents must have affirmatively indicated the subsurface conditions which form the basis of the plaintiff's claim; (b) the contractor must have acted as a reasonably prudent contractor in the interpretation of those documents; (c) the contractor must have reasonably relied upon the indications of the subsurface conditions; (d) the subsurface conditions actually encountered within the contract site must have differed materially from the conditions indicated in the same contract area; (e) the conditions encountered must have been reasonably unforeseeable; and (f) the claimed cost must be shown to be solely

---

[6] Article 108.09(b) of the Standard Specifications for Road & Bridge Construction states: "When a delay occurs due to unforeseen causes beyond the control and without the fault or negligence of the contractor including, but not restricted to acts of God, acts of the public enemy, governmental acts, fires, epidemics, strikes; extraordinary delays caused by utilities or railroad; extraordinary delays in delivery of materials caused by strikes, lockouts, wrecks, freight embargoes, government acts, inability to procure critical materials and work added to the contract which effects progress on the controlling item, THE TIME OF COMPLETION SHALL BE EXTENDED IN WHATEVER AMOUNT IS DETERMINED BY THE DEPARTMENT TO BE EQUITABLE ° ° °no extension of time will be granted for any delay or suspension of the work due to the fault of the contractor ° ° °.

attributable to the materially different subsurface conditions. (*Weeks Dredging & Contracting, Inc. v. United States* (1987), 13 U.S. Ct. Cl. 193.) The Joint Venture has established these six conditions. Scour is a physical condition. It is the tendency or propensity of the riverbed to move. Not all riverbeds perform in the same fashion given identical stresses. The scour encountered was different than what was indicated in the contract by virtue of the facts cited herein. The interpretation of the contract by the Joint Venture was reasonable based on the omission of any scour protection requirement in the contract at the Illinois bank piers. The Joint Venture did rely on the contract documents for a scour assessment evidenced by the fact that it provided significant scour protection at pier 12 and none at 9 and 10. The conditions encountered were not foreseeable in light of what was in the contract. The scour losses caused the damages suffered by the Joint Venture when the field of debris appeared in an unexpected and unanticipated fashion. The State's reliance on *Massman Contracting v. United States* (1991), 23 U.S. Ct. Cl. 24, is misplaced. In that case, the river flow volume was provided in a table attached to the contract documents as part of the contract specifications. However, the table provided was merely historical data given to the contractor as a general guideline for scheduling operations. The table specifically indicated that the contractor was to use it only as a guide for scheduling purposes. The Court stated that as a matter of common knowledge, weather conditions fluctuate from year to year and, therefore, the rainy season would effect those flows. The Court further held that no reasonable contractor would presume that this information constituted indications of river flow conditions for the specific years the contract was to be performed as the defendant could not be expected to predict weather conditions for the contract period. In reality, that

case was about predicting the weather. This case is not. In this case, the State knew or should have known of the potential for scour.

For these reasons, the Court finds that Claimant is entitled to an award for the damages stemming from the losses at piers 9 and 10 due to the changed conditions which the Joint Venture encountered during the construction process. The Court has very carefully reviewed the evidence in regards to the non-time related damages as a result of the scour losses at piers 9 and 10. Based on the evidence presented, the damages are very difficult for the Court to determine considering that the Claimant delayed the start of the project into the high water period, the Claimant designed and built the trestle, and the Claimant, as an experienced bridge builder, must have had prior experience with scour. We do, however, find that the State's knowledge of the scour potential in this case was vastly superior and that the very high water and the vast debris field were highly unusual. Because of these two facts, we impose liability on the State. The amount we find as compensable damages is Two Million Six Hundred Ninety-Four Thousand Five Hundred Thirteen Dollars ($2,694,513) for the Joint Venture's non-time related damages as a result of the scour losses at piers 9 and 10. This amount is the total damages minus the work trestle salvage and reconstruction amounts. The Court finds that the work trestle damages should not be awarded because the work trestle was not designed by the Department of Transportation. Additionally, as stated later in this opinion in regard to delay damages, construction damages are difficult to determine because of the inherent variables involved in construction. In computing the damages in this case for this part of the claim, we have considered that Claimant was responsible for the delay of the work into the high water period.

## Delay Damages, Acceleration and Unpaid Contract Balance

In addition to the actual damages sought by the Joint Venture for the losses heretofore discussed, the Joint Venture seeks the delay damages for the scour losses, the costs incurred by the Joint Venture in complying with IDOT's constructive order to accelerate the work, and the recovery of the unpaid contract balance of $681,819.86.[7]

In evaluating the Joint Venture's claim for these damages, we find that the three remaining categories of damages should be considered together due to the intricacies of the construction process.

The Claimant has made a claim for delayed or time-related costs which are associated with the piers 9 and 10 cofferdam losses. In order to prove its damages, the Joint Venture must show that, absent delay attributable to the Department of Transportation, it would have not sustained the damage of this nature. Various categories of damages have been found to be compensable in delay cases and the Joint Venture seeks substantial recovery for certain of those categories. Additionally, since the Joint Venture maintains that it encountered an inexcusable delay at the piers 9 and 10 locations after the scour losses, the Joint Venture seeks acceleration costs which occurred in the summer of 1979. The Joint Venture also sought damages as a result of the pier 12 falsework destruction. Since the findings on liability is against the Joint Venture on that cause of action, those acceleration costs will not be considered.

[7] The parties have stipulated that the contract sum as adjusted by change orders (exclusive of the Joint Venture's other claimed amounts) equals $20,596,649.09 and the Department has paid the Joint Venture $19,914,829.23. It is agreed that IDOT authorized change orders and time extensions which effectively extended the contract completion date to January 2, 1981. The Joint Venture completed its contract work on or about December 8, 1981.

In May of 1979, the Joint Venture asked IDOT for a response to earlier requests for time extensions to the contract completion date as a result of the scour losses suffered in 1979. It indicated that it would have to accelerate the work unless IDOT granted an extension to the completion date. Such acceleration would be accomplished through overtime, multiple shifts, and the addition of equipment and materials. The Joint Venture began such acceleration in June of 1979 by instituting an increased work week for its crews. On June 25, 1979, the Joint Venture was notified by IDOT that it was still considering the extension request. Finally, in a letter dated August 24, 1979, the Department denied responsibility for acceleration costs and informed the Joint Venture that it should take whatever steps were necessary to place the work on a schedule to be completed within the time limits stated in the original contract.

Acceleration occurs when a contractor is forced to perform the work in a shorter period of time than is called for in the contract. Acceleration can take different forms. A constructive acceleration occurs when the government denies or unreasonably delays in granting the contractor a time extension which is justified, and at the same time holds the contractor to the original completion date. (*Norair Engineering Corp. v. United States* (U.S. Ct. Cl., 1981), 666 F.2d 546.) The effect of such a position on a contractor is fairly obvious. If liquidated damages are provided for in the contract, as was the case here, the contractor is under additional pressure because it does not know whether it will be found liable for liquidated damages. In order to prove its entitlement for a recovery for acceleration, the Joint Venture must prove certain facts. The contractor must prove that it has encountered an excusable delay for which it is entitled to a time extension; it specifically requested an extension of time; the Department failed or

refused to grant the extension; that the Department caused the contractor to complete the work within the unextended contract period; and finally that the contractor actually accelerated the performance. *Contracting & Materials Co. v. City of Chicago* (1974), 20 Ill. App. 3d 684.

Excusable delays are dealt with in section 108.09 of the Standard Specifications. In pertinent part, that section reads as follows:

"When a delay occurs due to unforeseen causes beyond the control and without fault or negligence of the contractor, including but not restricted to acts of God, acts of the public enemy, governmental acts, fires, epidemics, strikes; extraordinary delays caused by utilities or railroad; extraordinary delays in delivery of materials caused by strikes, lockouts, wrecks, freight embargoes, governmental acts, inability to procure critical materials and work added to the contract which affects progress on the controlling item, the time of completion shall be extended in whatever amount is determined by the department to be equitable. * * * After a contractor has filed a request for an extension of time, the Department will notify the contractor, in writing, whether or not such extension will be approved. If approved, the extended date of completion shall then be considered as in effect the same as if it were the original date for completion."

The losses at piers 9 and 10 were of a catastrophic nature in the construction of this bridge. The Joint Venture made it clear to the Department that the impact of such losses required an extension of the contract time. Because a timely response was not forthcoming, the Joint Venture accelerated its efforts through various means. The Department belatedly acknowledged that the accumulation of debris against the work trestle was a fact which justified an extension of the contract time. However, by this time in 1981, the costs incurred as a result of the acceleration had already been indelibly imprinted on this project.

In this case, delay costs are claimed because of the additional time required to reconstruct piers 9 and 10. In order to make a recovery for those delay costs, events must have occurred which were beyond the control of the contractor and which delayed or extended its execution of

that part of the contract and directly affected the other parts of the contract. In some situations, those delays affect the performance time of the contract and in others, they do not. This depends on whether or not the event which is delayed is on the critical path of the project. "Critical path" is defined as the longest chain of events leading through the project and if delayed, delays the entire project. There are events which occur which are noncompensable and only entitle a contractor to an extension in the period of time during which to complete the contract. There are also events which occur and can result in additional funds being paid to the contractor. Delay costs must be considered here because the piers 9 and 10 scour losses result in an award for the non-time related claims.

There are certain requirements under the law before these compensable delay costs can be awarded. It is necessary for the party seeking the damages to first identify the compensable delays. In order to do so, each of the delays must be defined clearly so that it is possible to identify any concurrent delay. Concurrent delays could be noncompensable. This only occurs if it is shown the concurrent delay occurred at the same time as an excusable delay for which neither party is responsible, or it occurs at the same time as a contractor caused delay. In order for the Joint Venture to recover monies for the delay, the Joint Venture must prove the delay was the sole responsibility of the State; the delay occurred on the critical path of the project; and the delay was not concurrent with a contractor delay or excusable delay for which neither party is at fault. Once these delays are identified and isolated, the costs of those delays must be apportioned appropriately. *Pathman Construction v. Highway Electric Co.* (1978), 65 Ill. App. 3d 480.

The Joint Venture's time related damages are based on eight categories. These categories include the general

and administrative costs which were extended as a result of the scour losses, the extended equipment use as a result of those losses, the extended physical plant due to the loss, labor escalations due to the extension of the job time, material escalations due to the extension, the loss of efficiency created by the extensions, the need to move materials and equipment to higher grounds during flood periods as a result of the extensions, and finally ice utilized to cool concrete during the extremely hot summer period in 1981.

In order to prove its delay damages, the Joint Venture hired experts in the field of construction planning to undertake a comprehensive critical path method analysis of the project. Those experts were to determine the effect of the compensable events on the project's costs and on the additional time required for the project performance. The firm hired began its study in 1980, evaluating the as-built performance data provided by the contractor from the job site records, personal diaries kept by the Joint Venture on-site personnel, and a diary of the Illinois Department of Transportation resident engineer. Since they began their analysis while the project was incomplete, updated information was continually provided to them as work was completed on each item. The analysis, therefore, included the final as-built condition of the entire project. This first analysis is the project as it was actually constructed and is referred to as the as-built schedule. In addition, once the project was completed, a second schedule was prepared by that same firm which purports to show how the project would have progressed but for the delays alleged to have been caused by the Department of Transportation. This is a collapsed version of the as-built schedule. The compensable delays were removed from the first schedule to form the second.

In a construction job of this magnitude where there are a number of items being constructed simultaneously,

there are inevitable interdependencies or restraints.[8] A job such as this which is incredibly complex from the outset contains numerous changes, delays and problems which have a ripple effect on the entire project. For this reason, the schedules as prepared by the consultants hired by the Joint Venture contain a large number of errors which affect the weight of that evidence. Stuart Bartholomew, the man most closely involved with the Joint Venture's claim, who was on the job site a substantial portion of time, who was directly involved in the intimate process of preparing the bid, and who finally put together the claim against the Department of Transportation, testified at length regarding the compilation of Schedules A and B. Mr. Bartholomew had to admit that both schedules were replete with problems and corrections. While he tried to minimize those during the course of his testimony, it is clear that the method used to calculate the delay damages utilized by the Joint Venture was over-simplified and not credible. Further, the State hired construction experts for the purposes of examining the two schedules prepared by the Joint Venture. These witnesses used the original work schedules prepared by the Joint Venture in 1977, 1978 and 1980. Each of these schedules anticipated the progress and timing of the work from the date of its preparation forward. The State's experts evaluated the actual performance against the planned performance with a critical path method format. That evaluation revealed that the progress made by the Joint Venture during the first eight months was nil although experts were not needed to establish that. The construction of the trestle, the method of access into the river, and, therefore, a necessary ingredient to begin the cofferdam construction was delayed from the outset.

[8] The effect of one activity on a subsequent activity. An activity either has to be completed before the next activity starts or the first activity has to at least be started before the next activity can be done. There are crew restraints, equipment restraints and material restraints.

This delay ultimately caused delay of the entire project. Schedules showed that the Joint Venture had originally planned to have virtually all of its work done at piers 9 and 10 by March of 1978 complete through the columns. In reality, the work had not even begun. Certain revisions had to be made in the sequencing of the pier construction because of the failure to complete the trestle in April of 1978. In May of 1980, the schedule was revised for a third time. As the revisions became more common, the allotment of time for completion of an item increased. No doubt the experience was increasing the Joint Venture's knowledge of what it took to build a bridge in the Mississippi River.

The original contract completion date provided was October 1, 1979. The Joint Venture did not complete its responsibility on the Jefferson Barracks Bridge until December 8, 1981, over two years later. According to a schedule provided by the Joint Venture of how the job would have been built but for the delays attributable to the compensable losses, the date of completion would have been August of 1980.[9]

The pier 12 falsework loss took place in the spring of 1978. Up to that point, the job had proceeded for seven and a half months and the Joint Venture had been unable to comply with their as-planned schedule originally provided to the State. The Joint Venture's new schedule, revised in April of 1978, showed an attempt to recover lost time on the project and it also showed scheduling changes due to the Joint Venture's failure to progress on the trestle construction. A second revised schedule was issued in December of 1978 by the Joint Venture. However, the Joint Venture continued to be unsuccessful in matching its projections. Again,

[9] The period of time between August of 1980 and December of 1981 is not a fully compensable delay because the pier 12 loss is not a compensable loss. In addition, the Joint Venture dismissed claims regarding an extra trestle section prior to trial. A share of the delay damages attributable to construction and the removal of the original trestle is therefore not considered.

the lack of progress on the trestle caused the Joint Venture to reschedule its sequence of the piers. Piers 5 through 8 were all a number of months late in their construction time. The work on those piers ran concurrent with the new work on pier 12 as a result of the loss in the spring of 1978. The revised schedule issued in December of 1978 showed that the completion date for pier 12 was now July of 1980 which was seven and a half months after the original completion date of the contract. Pier 12 had now become a controlling item on the critical path and, therefore, on the completion of the contract. The delay attributable to pier 12 would therefore prevent the recovery of any delay costs for scour related losses if, in fact, those two were concurrent.

Additionally, the Joint Venture seeks to recover $681,819.86 that the Department of Transportation offset against the balance as liquidated damages. The Department has refused to pay these additional monies because it maintains that the Joint Venture completed the project 340 calendar days late without legitimate excuse. IDOT was permitted to withhold and offset liquidated damages pursuant to paragraph 12 of the Proposal which states as follows:

"In cases of failure to complete the work on or before the time named herein, or within such extra time as may have been allowed by extensions, the undersigned agrees the Department of Transportation shall withhold from such sums as may be due him under the terms of this contract, the costs, as set forth in the specifications, which costs shall be considered and treated not as a penalty but as damages due to the State from the undersigned by reason of added costs of engineering and supervision incurred by the Department resulting from the failure of the undersigned to complete the work within the time specified in the contract."

The standard specifications provided a schedule for the contractor's failure to complete the work on time and as the calendar days increased for such a failure, the amounts payable to the State gradually increased. As a result of delays for which the Department granted extensions, but not necessarily compensation, the contract completion date was

extended to January 2, 1981. In issue is the amount of delay which should be properly attributable to the scour-related losses and, therefore, what the properly extended contract completion date should be. The liquidated damages withheld represent the amount the State believes it should be compensated for the 340 calendar days between January 2 and December 8, 1981. The issue is whether the Joint Venture's request for extensions of time were dealt with in an appropriate fashion by the Department of Transportation. Naturally, IDOT argues that it did so and that the liquidated damages were withheld appropriately. The State's analysis of the delay attributable to the piers 9 and 10 cofferdams concluded that only 60 days should be added to the completion date as a result of those losses. The Joint Venture maintains that this analysis is defective in many respects. It also maintains that the project would have been completed late in November of 1982 had the Joint Venture stuck to the December, 1978, schedule and not resequenced the work, and that the salvage work at piers 9 and 10 legitimately took eighteen months. The location of that work directly impacted the sequence of work activities at four piers. The Joint Venture maintains that there was nothing in the contract compelling the Joint Venture to resequence the work after the scour losses had occurred, and that if it had resumed construction only after the excusable delaying events had been fully overcome, the project would have been completed months later than December, 1981.

The delay damages, the acceleration damages, and the liquidated damages are intrinsically joined. The Court finds that some delay damages should be paid to the Joint Venture although the Claimant's proof on the amount is not persuasive. The pier 12 loss affects those damages as delays attributable thereto are not compensable. Therefore, only a portion of both the constructive accelerated

costs and the liquidated damage costs should be paid to the Joint Venture. The portion should correlate to the total delay which is not concurrent with the pier 12 loss and that delay caused by the Claimant. The analysis for the determination of all of these damages is very difficult once the Claimant's analysis is rejected as we have done. The evidence on delay damages is conflicting. The Claimant's exhibits and testimony regarding these last three categories of claims are filled with errors. On the other hand, we find that we cannot say the Claimant suffered no delay damages as a result of the piers 9 and 10 scour losses.

The Claimant has the burden of proving its damages. (*McKinney v. State* (1983), 36 Ill. Ct. Cl. 20.) An award of damages cannot be based on conjecture. While the Court has rejected Claimant's analysis of damages, we must still review and weigh all of the evidence to determine if an award of damages can be made. (*Guarantee Electric Co. v. State* (1991), 43 Ill. Ct. Cl. 35.) We have painstakingly reviewed all of the evidence in the case in an attempt to determine if Claimant has presented enough evidence to prove its damages by a preponderance of the evidence. We have concluded that the Joint Venture was behind schedule from the very beginning of the project and that such delay was not caused by the Respondent. This original delay had a substantial effect on the entire project because it changed the sequence of events and the time of year in which the project proceeded. This is important because of the changing nature of the Mississippi River during the different seasons. We have also deleted those delays related to the pier 12 falsework loss, the trestle loss, and all concurrent delays. We are cognizant of the fact that most, if not all, construction projects will have delays of one form or another. For a delay to be tolerated, it must be reasonable under the circumstances.

Based on the foregoing examination of the evidence, and the fact that some delay is inevitable, and the inherently speculative nature of computing loss of efficiency, the Court finds that the delay damages, acceleration damages and unpaid contract balance damages are One Million Four Hundred Seventy-One Thousand Dollars ($1,471,000).

As is often the case, this figure is admittedly arbitrary but in light of the conflicting evidence, our rejection of Claimant's damage analysis, and the inherent variables in construction damage cases, we believe that the foregoing damage figure represents a fair amount. *Lowery Electric Co. v. State* (1991), 43 Ill. Ct. Cl. 52.

Finally, the question of entering an award remains. This Court cannot enter an award unless sufficient funds remain unexpended in the appropriation made to fund the project. (See discussion in *Loewenburg/Fitch Partnership v. State* (1986), 38 Ill. Ct. Cl. 227, and *Ude, Inc. v. State* (1982), 35 Ill. Ct. Cl. 384.) While there is no evidence in the voluminous record before the Court as to the exact amounts of released and unexpended funds from the project, the Court notes that both parties indicated at oral arguments that neither party was aware of any such funds beyond the $681,819.46 retainage.

It is this Court's policy in breach of contract claims to limit awards so as not to exceed the amount of funds, appropriated and lapsed, with which payment could have been made. To do otherwise would be the same as granting a deficiency appropriation. The appropriation of State funds is the constitutional prerogative of the Illinois General Assembly. It is the Court's duty to advise the General Assembly. *Thorlief Larsen and Son, Inc. v. State* (1990), 42 Ill. Ct. Cl. 195; *J.F. Inc. v. State* (1988), 41 Ill. Ct. Cl. 5.

The Court finds that Claimant has suffered damages as follows:

(a) Extra grinding ............................ $ 94,998.00

(b) Piers 9 and 10 scour losses ....... 2,694,513.00

(c) Combined delay damages,
    acceleration and unpaid
    contract balance ...................... 1,471,000.00

Total ...................... $4,260,511.00

An insufficient amount of funds lapsed to cover all of the damages.

The Court orders the Respondent to file with the Court the fiscal data on the project, including the balance of released funds which lapsed at the conclusion of the project within fourteen days. We will make a conditional order based on the parties' statements at oral arguments. Should the fiscal data filed by Respondent indicate either more or less lapsed funds, a supplemental order will be entered correcting the conditional order. Should the lapsed funds total $681,819.86 as indicated by the parties at oral arguments, then the conditional order will stand.

For purposes of potential consideration of this claim by the Illinois General Assembly and in fulfilling our role as an advisory body to the General Assembly, we reiterate our findings herein and point out that but for the insufficient amount of lapsed appropriations on the project, we would have awarded Claimant damages of $3,578,691.14 over and above the award made herein below.

Accordingly, it is conditionally ordered that Claimant, Fru-Con Corporation and Granite Construction, known as the Joint Venture, be and hereby is awarded the sum of $681,819.86 and the other claims are denied solely for the reasons stated herein.